In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00195-CR
______________________________


SHERMAN DEMETRIUS MARTIN, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 29996-A


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N
            After Sherman Demetrius Martin convinced Bobby Simpson to give him a ride, Simpson was
shot and killed with a handgun held by Martin. At trial, the central fact issue was whether the killing
was in self-defense. A jury convicted Martin of murder, and he was sentenced to fifty-two years'
imprisonment. He contends on appeal the trial court erred by overruling objections to various pieces
of evidence.
            We affirm Martin's conviction. In so doing, we dispose of Martin's points of error in the
following manner: (1) admitting testimony concerning Martin's possession of a firearm was not
error; (2) error was not preserved regarding Gerald Templeton's hearsay testimony concerning why
Martin was asked to leave after the shooting; (3) while the fact that Jacquelyn Templeton warned
Simpson not to go with Martin was already in the record and so, itself, presented no reversible error,
admitting her hearsay warning that Simpson's going with Martin would be the "worst mistake he ever
made" was error; (4) though her nonresponsive testimony that Martin had been "locked up" was
already in the record and thus presented no reversible error, admitting her accompanying
nonresponsive testimony that Martin had "started acting strangely" was error; but (5) the errors
regarding her testimony—items (3) and (4)—were not harmful.
            We use an abuse of discretion standard when reviewing the trial court's decision to admit
evidence. Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002); Burden v. State, 55 S.W.3d
608, 615 (Tex. Crim. App. 2001). An appellate court will not reverse a trial court's ruling unless that
ruling falls outside the zone of reasonable disagreement. Torres, 71 S.W.3d at 760.
1. Admitting Testimony Concerning Martin's Possession of Firearm was not Error
            Martin contends the trial court erred by allowing testimony regarding his possession of a
firearm. Martin testified that the only gun he ever possessed was a Tec-9 and that he never carried
a gun. The trial court allowed two rebuttal witnesses to testify for the State that Martin had carried
a pistol in his waistband around the time of the shooting.


 See Tex. Code Crim. Proc. Ann. art.
36.01, § 7 (Vernon Supp. 2004–2005).
            The purpose of rebuttal evidence is simply to directly counter testimony from another source. 
As a general proposition, when a party introduces matters into evidence, that invites the other side
to reply to that evidence. Wheeler v. State, 67 S.W.3d 879, 892 n.13 (Tex. Crim. App. 2002);
Kincaid v. State, 534 S.W.2d 340, 342 (Tex. Crim. App. 1976). The evidence is in rebuttal, and the
trial court did not abuse its discretion by allowing the testimony.
2. Error was not Preserved Regarding Hearsay Testimony Concerning why Martin was Asked to
Leave

            Martin also complains regarding the admission of Gerald Templeton's testimony concerning
the reason he asked Martin to leave after the shooting. The reason Gerald gave was that his sister-in-law had expressed her desire that Martin leave because, she said, he had killed someone. It is
essential to examine the context, the objections which were made, and the testimony which was
admitted:
Q. Okay. And how is it that you came in contact with Sherman Martin?
A. I was visiting my brother, and my sister-in-law was talking to me about him. 
[Counsel]:Your Honor, I'm going to object to hearsay.
The Court:I'll sustain as to hearsay.
                        [Prosecutor]:   You can't go into what your sister-in-law was talking to you about.
A. Oh, okay.
Q.Do you understand?
A. Yes, sir.
Q.Okay. How was it that you came in contact with Sherman Martin?
A.I was leaving, and he drove up in an automobile.
Q.And was he given directions once he got out of the vehicle?
A. Yes, sir.
Q. And did you have any conversation with Sherman Martin?
A. Yes, sir.
Q. What was your conversation with Sherman Martin?
            A.        I told him to leave because my sister-in-law had asked him to leave and told me to
tell him to leave.
 
Q. Okay. You told him to leave?
A. Yes, sir.
Q. Did you give him a reason why you told him to leave?
A. Yes, sir.
Q. What was that?
[Counsel]:Objection, Your Honor, hearsay.
The Court:What he said?
[Counsel]:Yes, sir.
The Court:Overruled.
Q. And the reason you told him to leave was why?
A. Because of the incident that had happened, and - -
Q. Well, let me just – what did you tell him?
A. I told him to leave because my sister-in-law said leave and don't come back.
[Counsel]:Objection, Your Honor, hearsay.
[Witness]:Well, she told me that.
The Court:Well, he can testify as to what he said. Go ahead.
Q.What did you tell Sherman Martin when he got out of the car?
            A.        I told him to leave because my sister-in-law told him to leave because he had messed
up, because he had killed somebody or something.
 
            Q.       Did you use the words, "You'd killed somebody"?
            A.       I remember saying it one or two times.
(Emphasis added.)
            To preserve error for appellate review, there must have been a timely request, objection, or
motion to the trial court, and a ruling by the trial court. Tex. R. App. P. 33.1(a)(1), (2); Tucker v.
State, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999). An objection must be made every time
inadmissible evidence is offered. Tex. R. App. P. 33.1; Ethington v. State, 819 S.W.2d 854, 858
(Tex. Crim. App. 1991); Long v. State, 10 S.W.3d 389, 399 (Tex. App.—Texarkana 2000, pet. ref'd). 
An alternative is to get the trial court's approval for a continuing objection. Sattiewhite v. State, 786
S.W.2d 271, 283 n.4 (Tex. Crim. App. 1989).
            Ultimately—probably because the trial court had overruled two prior objections to questions
concerning why Gerald told Martin to leave—the embedded hearsay contained in Gerald's
subsequent testimony was not objected to; therefore, error in its admission was not preserved. There
are two factors contributing to our conclusion that error was not preserved: first, counsel did not
object each time the evidence was offered, as is required; and, second, the objections were, in the
trial court's thinking, directed at only Gerald 's quotes of his own words, not his sister-in-law's words. 
When the hearsay objections were made, the trial court clearly believed counsel's concern was just
about what Gerald said. At no time did counsel point out to the trial court that the real concern was
over the sister-in-law's embedded hearsay statement that Martin "killed somebody." The admitted
evidence quoted specific claims of the sister-in-law and therefore was different in nature from, "what
[Gerald] said," the only thing discussed when the objections were made earlier. Because there was
no objection at that time, the trial court was not given the chance to rule on the admissibility of the
embedded hearsay. Thus, error was not preserved.
3. It was Error to Admit Jacquelyn Templeton's Hearsay Warning that Simpson's Going with Martin
would be His "Worst Mistake"

            Martin complains of testimony by Jacquelyn Templeton in which she recounted her part of
a conversation she had with Simpson and Martin shortly before the shooting, during which she told
Simpson—in Martin's presence and after Martin asked Simpson for a ride—that "it was going to be
the worst mistake he ever made, not [sic] to be fooling with [Martin] at that time. I told him not to
take [Martin] in his truck, but he did anyway." Counsel objected based on hearsay. Hearsay is
defined as a statement, other than one made by the declarant while testifying at the trial, offered in
evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d).
            The State argues on appeal that this is not hearsay because the recounted statement is not one
offered for the factual content, but for the declarant's belief or opinion about her suspicions. We
disagree. The same contention was rejected by this Court earlier this year:
Such reasoning, if approved, would make any opinion admissible, even though the
facts on which such opinion is based are inadmissible, without recourse to the
hearsay objection. This is not consistent with the rule. "Matter asserted" includes
any matter explicitly asserted, and any matter implied by a statement, if the probative
value of the statement as offered flows from the declarant's belief as to the matter. 
Tex. R. Evid. 801(c). Hearsay evidence is not admissible. See Tex. R. Evid. 802. 
The matter asserted in this case was the opinion. It was hearsay and inadmissible.
May v. State, No. 06-03-00168-CR, 2004 WL 1403168, at *8 (Tex. App.—Texarkana June 24, 2004,
pet. ref'd). Likewise, this testimony by Jacquelyn was hearsay.
            We note, however, that the information was already at least partially in the record. The
record reveals that testimony somewhat to the same effect—though less powerful—was previously
admitted through the same witness:
Q.All right. On - - about 12:00 o'clock, what happened?
 
A.He [Martin] came to the door and knocked, and I saw a truck outside, and it
was Bobby [Simpson]. And I asked him [Martin] what he wanted, and he said he
was looking for Ken. And I went and talked to Bobby, and I was trying to tell
Bobby that he didn't need to hang with Sherman, but - - 

(Emphasis added.) This testimony was not objected to and is in the same vein as the objected-to
testimony. Although it is not as readily recognizable as hearsay, and certainly not as dramatically
phrased as the objected-to testimony, nonetheless this hearsay, too, recounts a warning from
Jacquelyn that Simpson not spend time with Martin that night. So, we conclude that the fact she
warned Simpson was previously in the record.
            Generally, an objection must be made every time inadmissible evidence is offered. 
Ethington, 819 S.W.2d at 858. Where a party fails to make a timely objection each time particular
testimony is offered, no reversible error is presented. See Leday v. State, 983 S.W.2d 713, 718 (Tex.
Crim. App. 1998); Ethington, 819 S.W.2d at 858. Therefore, the subsequent admission of the fact
that Jacquelyn warned Simpson about spending time with Martin does not constitute reversible error.
            The objected-to hearsay, however, contained a dramatic piece of information not
communicated in the earlier testimony, that spending time with Martin that night "was going to be
the worst mistake he ever made." We hold that phrase was erroneously admitted. We analyze its
harmfulness in section five of this opinion.
4. Admitting Nonresponsive Testimony that Martin had been "Locked Up" was not Error, but
Admitting Testimony that Martin "Started Acting Strangely" was Error

            Martin also contends the trial court erred by overruling his objection to volunteered,
nonresponsive testimony by Jacquelyn:
Q.Okay. And this gun - - you say Sherman would come over to your house every day?
 
A.Mostly every day, unless he was locked up. He had been coming to my house
ever since he was a child. He was like a son to me until he after [sic] started acting
strangely, and I had - -
 
[Counsel]:I move to strike as nonresponsive, your Honor.
 
The Court:Overruled.

(Emphasis added.)
            The challenged testimony was not responsive to the question, which was whether Martin
came over to Jacquelyn's house every day. The two, arguably damaging, nonresponsive elements
to her answer were that Martin was at least occasionally "locked up" and that he had started acting
strangely.
            The stronger information, that Martin was at least occasionally "locked up," had previously
entered the record without objection. On direct examination of Jacquelyn by the State, this exchange
had occurred:
Q.Okay. And how often would you see Sherman?
 
A.Almost every day, unless he was locked up or something, because him [sic]
and my nephew is [sic] like brothers."

(Emphasis added.)

            Generally, an objection must be made every time inadmissible evidence is offered. 
Ethington, 819 S.W.2d at 858. Where a party fails to make a timely objection each time particular
testimony is offered, no reversible error is presented. See Leday, 983 S.W.2d at 718; Ethington, 819
S.W.2d at 858. We hold that overruling counsel's objection to Jacquelyn's volunteered phrase
"unless he was locked up" presents no reversible error, since it was already in the record without
objection.
            Yet the objected-to testimony included the volunteered phrase "until he after [sic] started
acting strangely." That comment was not responsive to the question asked, and the trial court erred
by overruling the objection to that extent.
 
 
 
 
5. Preserved Errors were not Harmful
            The next step is to apply a harm analysis to the preserved errors. Ordinarily, the admission
of inadmissible evidence constitutes nonconstitutional error.


 In our review of nonconstitutional
error, such as that found here, we are to disregard errors, defects, irregularities, or variances that do
not affect substantial rights of the accused. Tex. R. App. P. 44.2(b). A "substantial right" is affected
when the error had a substantial and injurious effect or influence in determining the jury's verdict. 
King v. State, 953 S.W.2d 266 (Tex. Crim. App. 1997).
            If, after examining the whole record, we find that error "may have had 'substantial influence'
on the outcome of the proceeding,"


 we should reverse. Burnett v. State, 88 S.W.3d 633, 637 (Tex.
Crim. App. 2002). If there are multiple errors, we should consider their cumulative effect in our
analysis. Stahl v. State, 749 S.W.2d 826 (Tex. Crim. App. 1988); see Harris v. State, 56 S.W.3d 52,
59 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).
            If we have "a grave doubt" that the result was free from the substantial influence of preserved
error, then we must reverse. Burnett v. State, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002). "Grave
doubt" means that, "in the judge's mind, the matter is so evenly balanced that he feels himself in
virtual equipoise as to the harmlessness of the error." Id. Thus, "in cases of grave doubt as to
harmlessness the petitioner must win." Id. We have no such doubt. The errors were harmless.
            Our more significant concern relates to the hearsay statement that Simpson's spending time
with Martin that night "was going to be the worst mistake he ever made." This dramatic,
erroneously-admitted, hearsay testimony was mentioned—once—in the State's jury argument, thus
giving it some prominence. The phrase suggests Jacquelyn's belief regarding Martin's dangerousness
to Simpson shortly before the shooting—an idea which was already in the record without
objection—and tends to promote the State's position that Martin was not acting in self-defense and
was thus guilty of murder. The other erroneously admitted testimony, about Martin "acting
strangely," is so vague as to strongly suggest it had no effect on the verdict, especially in light of our
harm analysis, below.
            On review of the record, we conclude the "worst mistake" phrase is a small piece of debris
floating in a sea of evidence tending to show Martin's consciousness of guilt, partial admissions, and
numerous inconsistencies. Though there is certainly evidence on both sides, the important
conflicting evidence comes from Martin on one side and a host of witnesses on the other.
            There is evidence both that Martin was carrying a pistol and that he was not, and a jury could
conclude that Martin was carrying a gun. Martin admitted that he went with Simpson and shot him,
but there is evidence that Martin was bruised, and no evidence to the contrary—supporting his
position that a struggle took place between them. But the fact a struggle took place proves nothing. 
The injuries could have resulted from either Simpson's attempts to defend himself or from an
unprovoked attack. The evidence also shows that Simpson had used cocaine shortly before they
drove away together.
            Martin testified at trial that he had borrowed Simpson's truck and that, once Martin was in
the truck, Simpson directed him into a location near Simpson's home, where Simpson was going to
wait for Martin to return. Martin testified that, when he stopped the truck, Simpson began hitting
him in the head in an apparent robbery attempt.


 He said that, after landing several blows, Simpson
appeared to be trying to reach something below him, that he managed to yank up Simpson's arm and
bite it, and that, when he looked down, he saw Simpson trying to get a gun.


 Martin testified they
wrestled over the gun and it went off, shooting Simpson. Martin then got out of the pickup truck
with the gun and ran to a nearby house to seek help. The house owner called the police, and Martin
panicked, being concerned that he might already be wanted on other warrants, drove the truck away,
and left Simpson there and still alive, according to Martin's testimony. 
            The doctor who performed the autopsy testified the gun was fired from between a few inches
and a couple of feet from the victim. He also testified that a blood test showed the victim had a low
level of alcohol and cocaine in his blood, as well as metabolites created as cocaine broke down in
the body. On cross-examination, the doctor also testified that a mark on Simpson's forearm could
have been the result of a bite. 
            But by far the greater bulk of the evidence lines up against Martin.
            The truck in which Simpson's shooting occurred was burned shortly after the shooting. 
Though Martin denied knowing how it was burned, he admitted believing that one of his "home
boys" probably burned it so Martin would not go to jail. Jacqueline, however, testified that Martin
told her after the shooting he was going to burn the truck. Gerald testified that Martin admitted later
that evening to having burned the truck, so he would not get into trouble. There was expert
testimony that, based on examination of the burned truck, it had been intentionally burned with
gasoline. Martin testified he had told only Jacquelyn where he had parked the truck after the
shooting. If the truck had been burned by any friend of Martin other than Jacquelyn, she or Martin
must have told someone else the location of the truck. There was no evidence anyone, other than
those two, knew the location of the truck. Though Martin admitted abandoning the truck, he does
not account—other than with speculation—for how it was burned.



            Martin denied owning or having a gun, but there was contrary evidence from two of Martin's
acquaintances. This evidence was that Martin owned a large black semi-automatic handgun he had
given the name "Black Beautiful." There is testimony that Martin was carrying a handgun in his
pants the night of the shooting. Martin admitted returning to the scene of the shooting while
Simpson was still alive, putting the gun to Simpson's head, and demanding that the wounded
Simpson drive him back to Longview. When Simpson said he could not drive, Martin admits he
drove himself back to Longview. No firearm was recovered, but a firearm expert opined that the
shell casing recovered from the truck was consistent with the use of a semi-automatic pistol in the
shooting. Though Martin admitted having possession that evening of the gun that killed Simpson,
he does not account for what happened to it. 
            Martin denied that, during the confrontation between Simpson and Martin, they exchanged
any words at all. But there was contrary evidence from two bystanders in the immediate area of the
shooting. Maurice Earl was awakened that night by a loud noise and heard a spoken threat, "I'll kill
you." A few seconds later, Earl saw a tall, slim, shirtless black man quickly walking. That
description was consistent with Martin's appearance. Though Earl says he did not clearly hear a
gunshot, the loud noise that awakened him may have been the shot. Eddie Jackson, another resident
in the area of the shooting, testified he got up from his couch when he heard loud arguing from two
people outside. After he laid back down on the couch, he heard a gunshot. He got up again and saw
a young, dark-skinned, shirtless man with braided hair—again a description consistent with Martin's
appearance—come trotting up to the Jackson house with a large, dark, semi-automatic pistol. 
Neither bystander could identify any party to the conversation, but there is no evidence of any other
confrontation in that location that night.
            When the State cross-examined Martin comparing his custodial statement with his trial
testimony, many contradictions and inconsistencies were developed. While Martin's statement
recounted, "I shot him," his live testimony insisted "the gun went off" accidentally during a struggle.


 
His statement indicated Simpson got tangled in the steering wheel, though at trial Martin denied that
happened. Martin's statement indicated his belief that Simpson had been shot "in the left"
side—consistent with the physical evidence—while his live testimony maintained Martin thought
Simpson had been shot in the leg. In his trial testimony, Martin maintained that, during the struggle,
Simpson had patted Martin's pocket, indicating to Martin that Simpson intended to take his money,
though Martin's statement omitted any reference to that detail. Time after time, as Martin was
confronted with inconsistencies, he was relegated to a weak surmise that the officer who prepared
the statement had made yet another mistake, despite Martin's signature on the completed statement.
            The evidence showed Martin fled the scene of the shooting and did not want authorities
called after the shooting.


 It showed he did not report the incident—which he portrayed
inconsistently as an accidental or self-defense shooting on the heels of Simpson's attempted robbery
of Martin—to police and delayed turning himself in until two days after the shooting. Martin also
reportedly told officers initially that he knew nothing about the shooting, before changing his mind
and making his statement. 
            Outside of Martin's own testimony, which the jury apparently did not believe—and, we are
convinced, would not have believed even without the two pieces of erroneously admitted
evidence—the evidence leads to the firm conviction that, after shooting Simpson, Martin, in a course
of action consistent only with a consciousness of guilt, fled the scene of the shooting, burned the
truck where the shooting occurred, disposed of the murder weapon, changed into clean clothes, and
tried to avoid police for a couple of days.
            In light of the record as a whole, we are reasonably assured that the errors, considered
together, did not substantially influence the jury's verdict. Therefore, they were not harmful. See
Tex. R. App. P. 44.2.
            We affirm the judgment.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          July 21, 2004
Date Decided:             October 26, 2004

Publish