Affirmed and Memorandum Opinion filed February 24, 2011.



 



In The

 

Fourteenth Court of Appeals

                                                                                          



NO. 14-09-00846-CR



 

TIMOTHY CRAIG ALLEY, Appellant

V.

THE STATE OF TEXAS, Appellee

 



On Appeal from the 248th
District Court

Harris County, Texas

Trial Court Cause No. 1170849



 

MEMORANDUM OPINION

A jury
convicted appellant, Timothy Craig Alley, of aggravated assault and assessed
punishment at five years’ confinement.  In four issues, appellant contends the
evidence is factually insufficient to support the jury’s rejection of his self-defense
theory, the trial court erred by allowing the State to bolster the complainant’s
credibility, and trial counsel was ineffective during the punishment phase.  We
affirm.

I.   Background

In May
2008, appellant lived in the Lake Shadows subdivision in Crosby, Texas.  The
subdivision was bordered in part by Lake Houston and had a private boat launch
secured by a locked gate.

On May
10, 2008, Raymond Balcerowicz and his ten-year-old son were in their boat
floating next to a dock near the boat launch while waiting for Raymond’s wife,
Rebecca.  Appellant, a fifty-two year-old man, approached and made “small talk.” 
Appellant then returned to his truck, drove through the gated entrance/exit,
and exited his truck to close and lock the gate.  Simultaneously, Rebecca drove
up to the gate in her vehicle, but appellant’s truck blocked her entry.  As
outlined below, the details of the subsequent interaction between appellant and
the Balcerowiczes are vigorously disputed. 

According
to Raymond, while still in his boat, he “hollered” at appellant to allow
Rebecca to enter.  Appellant responded, “[T]he gate’s supposed to stay locked
at all times,” but then reversed his truck to allow Rebecca to enter. 
Appellant then parked sideways in front of Raymond’s truck, exited, and argued
with Raymond “back and forth about the gate.”  When Rebecca entered the boat,
Raymond said, “Hold [the boat] for a minute, I want to talk to this guy.” 
Raymond intended to record appellant’s license plate number so that he could
report appellant to the homeowners’ association.  Raymond exited the boat and
walked up the dock toward appellant.  The men continued to argue about the
gate, but Raymond did not threaten appellant with bodily harm.  When Raymond
was approximately thirty yards from appellant, appellant drew a handgun from a
holster located underneath the right side of his shirt and pointed the gun
directly at Raymond.  Raymond put his hands up, asked “What’s wrong, what’s the
problem?,” and explained, “All I want is your information, I need to know who
you are, where you live.”  The men continued to argue “for a minute,” at which
point appellant holstered his gun.  Appellant returned to his truck, and
Raymond walked to his truck, trying to maintain a distance from appellant. 
Raymond intended to retrieve a pencil and paper from his truck; he did not have
any weapons on his person or in his truck or boat.  A truck belonging to
Raymond’s friend was parked parallel to Raymond’s truck, with the driver’s side
facing the passenger’s side of Raymond’s truck.  

As
Raymond approached his truck, he came “face to face” with appellant.  Appellant
took a step backward and reached for his right side.  Believing appellant was
reaching for his gun, Raymond knocked appellant into his truck and wrestled him
to the ground.  Rebecca was looking in her purse for a pen and did not witness
how this altercation began.  Raymond took appellant’s gun, threw it aside, and
instructed Rebecca to hide the gun.  The men continued to wrestle, and Raymond
hit appellant.  After “probably [less than] a minute,” Raymond stopped fighting
because appellant “quit fighting back.”  Raymond then headed for his truck.  

Raymond’s
truck keys were in the boat, and he told Rebecca to unlock the truck remotely.  He
also told Rebecca to find a pen and paper, but she could not find a pen.  Raymond
testified that he did not remember opening the door to his truck before appellant
returned.  However, Rebecca testified she saw Raymond emerge from his truck
with nothing in his hands.  Raymond testified that appellant approached him from
behind and said “something.”  Raymond turned and saw appellant standing eight
feet away with a different handgun drawn.  According to Raymond, “When I turned
around[,] . . . we were facing each other real close together, and he just
pulls the weapon straight up and I turned sideways, but like I said I was
trapped between two trucks, I didn’t know where to go when he shot me.”  Raymond
testified he never threatened appellant before the shooting, but made clear to
appellant that he just wanted to write down appellant’s license plate number.

Appellant
shot Raymond in the right side of his torso, and Raymond went down “on [his]
hands and knees.”  The bullet penetrated Raymond’s spleen.  Appellant then
approached and placed the gun “almost against [Raymond’s] forehead.”  Rebecca
screamed and started running toward the boat.  Appellant yelled, “[W]here in
the F do you think you’re going, lady,” and pursued Rebecca.  Raymond ran after
appellant and struck him, causing appellant to drop his gun.  Rebecca testified
that she retrieved this gun and placed it next to the other gun.    

According
to Raymond, he dragged appellant “back over by [appellant’s] truck,” and began
“hitting [appellant] and punching him wherever I can and whenever I can.” 
Raymond tired and lay across appellant, holding him against the ground. 
Appellant then drew a pocketknife with a three-inch blade and stabbed Raymond
in the shoulder area three times.  With the third stabbing, appellant “gritted
his teeth and started twisting [the knife] back and forth.”  Raymond shoved his
thumb into appellant’s right eye socket, and appellant withdrew the knife. 
Raymond’s hand was stabbed several times as he attempted to take the knife from
appellant.  Rebecca unsuccessfully attempted to take the knife and also
attempted to call 911, but her cell phone did not have service. 

At that
point, Minnie Chevalier, a retired sergeant with the Houston Police Department,
arrived.  Chevalier lived nearby and heard, but did not see, the shooting.  She
called 911 and then proceeded to the boat launch.  Chevalier told the men to
stop fighting, but Raymond explained he would not allow appellant to stand
until he released the knife.  Appellant gave Chevalier the knife, and the men
separated.  Chevalier testified that both men were in pain and appellant said
he could not move.  Chevalier called 911 again from the boat launch.

Appellant’s
account of the altercation differed significantly.  According to appellant,
when he was about to close and lock the gate, he could not hear what Raymond
was yelling because it was windy and appellant is hearing impaired.[1] 
However, appellant saw Raymond gesturing with both middle fingers.  Appellant
reversed his truck to allow Rebecca to enter the gate and then stood outside
his truck.  When Raymond waved for appellant to come speak with him, appellant
pulled his truck in front of Raymond’s truck.  Raymond was yelling at
appellant, so appellant rolled down his window but still could not hear what Raymond
was saying.  Appellant exited his truck in order to hear Raymond.  Raymond left
his boat and began “walking at an extremely fast pace right directly at
[appellant.]”  Appellant asked Raymond “what was wrong,” but Raymond did not
reply.  When Raymond was within eighteen feet of appellant, Raymond said, “Who
made you the F-ing ranger of the boat ramp?”  Appellant, believing Raymond was
“quite upset,” began to back up toward his vehicle.  When Raymond was within
five feet, appellant saw that Raymond’s face was red and both fists were
clenched.  Appellant asked Raymond several times to stop and talk, but Raymond
did not respond.  Believing he was about to be attacked, appellant drew his
handgun and pointed it at the ground.  It was undisputed that Raymond is much
larger than appellant.  Additionally, appellant testified that he was disabled
due to serious back problems and was unable to defend himself.  

After
appellant drew his gun, Raymond stopped and asked who appellant was.  Appellant
responded he lived in the subdivision and was supposed to close the gate. 
Appellant believed the situation had “cooled off” at that point.  Raymond said,
“[Y]ou’re going to jail for pulling a gun on me,” and told his wife to call the
police.  Appellant then turned and was holstering his gun when Raymond struck
him in the back of the head, knocking appellant into his truck and rendering
him unconscious.  When appellant regained consciousness, he was being violently
beaten by Raymond.  Rebecca screamed for Raymond to stop because he was killing
appellant.  Raymond eventually stood and said something that “scared
[appellant] to death.”  The substance of Raymond’s statement was not admitted
at trial; however, appellant testified that the statement made him believe
Raymond intended to retrieve a weapon from his truck.

Appellant
crawled to his truck and lay across the front seat.  He was in pain and disoriented. 
Appellant saw Raymond digging through the glove box of Raymond’s vehicle and
believed he was looking for a weapon.  Appellant did not know where his handgun
was, so he retrieved a second handgun from his truck.  He then exited and,
using his truck for support, walked around to the tailgate.  At this point,
Raymond was still looking through his glove compartment.  Raymond exited his
truck, looked at appellant, and ran “towards [him] as fast as a man can
possibly sprint.”  Appellant took a few steps back, raised his gun, and fired
once at Raymond.  The shot “did not phase” Raymond, and he tackled appellant
and began to choke him.  Appellant dropped the gun and saw Rebecca retrieve it. 
Appellant began to lose consciousness, and Raymond tried to tear appellant’s
right eye out.  Appellant took out his pocketknife and stabbed Raymond once
under the left armpit.  Chevalier then arrived and, according to appellant, he
asked her to take the knife.

Shortly
thereafter, officers began arriving on the scene.  One officer testified that,
when he arrived, he saw “a male laying at the end of [appellant’s truck] on the
back side of the vehicle and another male laying just west of him
approximately, give or take, 10 feet away from each other.”  Raymond was taken
by helicopter to the hospital, where he received emergency surgery to repair
his spleen.  Appellant sustained a serious injury to his eye, broken bones in
his wrist, and various injuries to his face.  Appellant was taken by ambulance
to a different hospital.    

II.   Sufficiency of the Evidence

            In his first
issue, appellant contends the evidence is factually insufficient to support the
findings that he committed aggravated assault and did not act in self defense.

A.        Applicable
Law and Standard of Review

A person
commits aggravated assault if he intentionally, knowingly, or recklessly causes
serious bodily injury to another.  Tex. Penal Code Ann. §§ 22.01(a)(1),
22.02(a)(2) (West Supp. 2009).

A person is justified in using force
against another when and to the degree he reasonably believes the force is
immediately necessary to protect himself against the other’s use or attempted
use of unlawful force.  Id. § 9.31(a) (West Supp. 2009).  The use of
force against another is not justified in response to verbal provocation alone. 
Id. § 9.31(b).  “Reasonable belief” refers to “a belief that would be
held by an ordinary and prudent man in the same circumstances as the actor.”  Id.
§ 1.07(a)(42) (West Supp. 2009).  A person is justified in using deadly force
(1) if he would be justified in using force under section 9.31 of the Penal
Code, and (2) when and to the degree he reasonably believes the deadly force is
immediately necessary to protect himself against the other’s use or attempted
use of unlawful deadly force.  Id. § 9.32(a)(1), (2)(A) (West Supp.
2009).       

The initial burden to produce
evidence supporting self-defense rests with the defendant.  Zuliani v. State,
97 S.W.3d 589, 594 (Tex. Crim. App. 2003).  Once evidence is produced, the
burden shifts to the State to disprove the defense beyond a reasonable doubt.  Id. 
This burden of persuasion is not one that requires the production of evidence,
but requires only that the State prove its case beyond a reasonable doubt.  Id. 
When a jury finds the defendant guilty, there is an implicit finding against self-defense.  Id.  

While this appeal was pending, five
judges on the Texas Court of Criminal Appeals held that only one standard
should be employed to evaluate whether the evidence is sufficient to support a
criminal conviction beyond a reasonable doubt: legal sufficiency.  See Brooks v. State, 323 S.W.3d 893, 894–95 (Tex. Crim. App.
2010) (plurality op.); id. at 926 (Cochran, J., concurring).
 Accordingly, we review appellant’s challenge to factual sufficiency of
the evidence under the legal-sufficiency standard.  See Pomier v. State,
326 S.W.3d 373, 378 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (applying
single standard of review required by Brooks); see also Caddell v.
State, 123 S.W.3d 722, 726–27 (Tex. App.—Houston [14th Dist.] 2003, pet.
ref’d) (explaining that this court is bound to follow its own precedent).

When reviewing sufficiency of the
evidence, we view all of the evidence in the light most favorable to the
verdict to determine whether the jury was rationally justified in finding guilt
beyond a reasonable doubt.  Brooks, 323 S.W.3d at 899 (plurality op.).  We
may not sit as a thirteenth juror and substitute our judgment for that of the
fact finder by reevaluating the weight and credibility of the evidence.  Id.
at 899, 901; Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App.
1999); see also Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App.
1986) (expressing that jury may choose to believe or disbelieve any portion of
the testimony).  We defer to the fact finder’s resolution of conflicting
evidence unless the resolution is not rational.  See
Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  When
reviewing the legal sufficiency of the evidence supporting a finding against self-defense, we view the evidence in
the light most favorable to the verdict to see if any rational trier of fact
could have found (1) the essential elements of the charged offense beyond a
reasonable doubt, and (2) against appellant on the self-defense issue beyond a reasonable doubt.  See Hernandez
v. State, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet.
ref’d).

B.        Analysis

It is undisputed that appellant intentionally
caused serious bodily injury to Raymond by shooting him with a handgun.  Thus,
we must determine whether the evidence is sufficient to support the jury’s
finding that appellant was not justified in using deadly force.  

According to Raymond, at the time of the
shooting (1) his initial altercation with appellant had ended, (2) appellant
was aware Raymond merely wanted to write down appellant’s license plate number,
(3) Raymond was standing outside his truck, (4) appellant came up from behind
Raymond, (5) Raymond turned and saw appellant standing eight feet away with a
handgun drawn, and (6) appellant shot Raymond.  Additionally, Rebecca witnessed
Raymond and appellant walk toward each other, appellant quickly draw a gun and
shoot Raymond, and Raymond fall to his knees.  This evidence supports the
jury’s finding that an ordinary and prudent man in appellant’s position would
not have believed the use of deadly force was immediately necessary to protect
himself against Raymond’s use or attempted use of unlawful deadly force.  The
jury was entitled to believe Raymond’s and Rebecca’s testimony and disbelieve
appellant’s testimony.  See Clayton, 235 S.W.3d at 778.  Accordingly, we
conclude the evidence is factually sufficient to support the jury’s implied finding
beyond a reasonable doubt that appellant was not justified in using deadly
force against Raymond.  We overrule appellant’s first issue. 

III.   Witness Bolstering

            In his second
and third issues, appellant contends the trial court erred by allowing (1)
Raymond to testify he has never been in trouble with the law, and (2) the
prosecutor to argue that the State’s witnesses testified consistently with
their police statements, which were not admitted into evidence.

            The following
exchange occurred at the beginning of the State’s direct-examination of
Raymond:

[Prosecutor:] 
Have you ever been in trouble with the law or been convicted of any felonies or
crimes of moral turpitude?

[Appellant:] 
Object to relevance.

[Trial
Court:]  Overruled.  You may answer.

[Raymond:] 
No.

By
asking Raymond whether he had “ever been in trouble with the law,” the State
did not seek general background information, such as employment or education,[2]
or seek to rehabilitate his impeached character;[3]
the State’s sole purpose was to bolster Raymond’s credibility “without
substantively contributing ‘to make the existence of a fact that is of
consequence to the determination of the action more or less probable than it
would be without the evidence.’”  Rivas v. State, 275
S.W.3d 880, 886 (Tex. Crim. App. 2009) (quoting Cohn v. State, 849
S.W.2d 817, 819–820 (Tex. Crim. App. 1993)).  Thus, the question was
irrelevant, see Tex. R. Evid. 401, and the trial court erred by
overruling appellant’s objection.

During jury
argument, the prosecutor argued as follows:

[Prosecutor:] 
I want you to take all the evidence back
and look at everything and think about how both of their stories are similar in
some ways but vastly different in others and I want you to keep in mind that
Raymond and Rebecca and the witnesses all gave statements that night and the
defense counsel has had access to those statements.  You don’t get those
statements, they’re not entered into evidence but had anything been different
that they said that night - - 

[Appellant:] 
Objection. . . .  Outside the record.

[Trial
Court:]  It’s overruled.

[Prosecutor:] 
If anything was different than what they
said that night versus yesterday on the stand you would have heard about it.
Those statements are not in evidence but you can consider everything that they
said on the stand as testimony.

During
jury argument, the State is allowed wide latitude in drawing inferences from
the evidence as long as the inferences drawn are reasonable and offered in good
faith.  Cantu v. State, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997). 
However, argument that attempts to introduce matters not in the record is
clearly improper.  See Berryhill v. State, 501 S.W.2d 86, 87 (Tex. Crim.
App. 1973).  Argument inviting the jury to speculate about possible evidence
that is not in the record is even more dangerous because “it leaves to the
imagination of each juror whatever extraneous ‘facts’ may be needed to support
a conviction.”  Id.

Several
witnesses testified that Raymond and Rebecca provided statements after the
incident occurred.  However, the prosecutor argued outside the record when, in
an attempt to bolster credibility, she suggested that Raymond’s and Rebecca’s statements
mirrored their trial testimony.  A prosecutor may not interject
matters outside the record to bolster the credibility of a witness.  See Menefee v. State,
614 S.W.2d 167, 168 (Tex. Crim. App. 1981).  Thus, the trial court erred by overruling
appellant’s objection to this argument.  We next consider whether these errors
were harmful.     

We
review the trial court’s erroneous evidentiary and jury-argument rulings for
harm under Texas Rule of Appellate Procedure 44.2(b).  We must disregard non-constitutional
errors that do not affect a criminal defendant’s “substantial rights.”  Id. 
We may not reverse if, after examining the record as a whole, we have fair
assurance that the errors did not have a substantial and injurious effect or
influence in determining the jury’s verdict, or had but a slight effect.  Casey
v. State, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007); Johnson v. State,
967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  Stated differently, if we have “a
grave doubt” that the result was free from the substantial influence of the
error, we must treat the error accordingly.  Burnett v. State, 88 S.W.3d
633, 637–38 (Tex. Crim. App. 2002) (citation omitted).  “Grave doubt” means
that “in the judge’s mind, the matter is so evenly balanced that he feels
himself in virtual equipoise as to the harmlessness of the error.”  Id.
(citation omitted). 

In assessing the likelihood that a jury’s decision was
adversely affected by the errors, we consider everything in the record,
including any testimony or physical evidence admitted, the nature of the
evidence supporting the verdict, the character of the alleged error and how it
might be considered in connection with other evidence, and the cumulative
effect of the trial court’s errors.  See Motilla v. State, 78 S.W.3d
352, 355 (Tex. Crim. App. 2002); Martin v. State, 151 S.W.3d 236, 242
(Tex. App.—Texarkana 2004, pet. ref’d); Harris v. State, 56 S.W.3d 52,
59 (Tex. App.—Houston [14th Dist.] 2001, pet. ref’d).  We may consider
statements made during voir dire, jury instructions, the State’s theory of the
case, any defensive theories, closing argument, and whether the State
emphasized the errors.  Motilla, 78 S.W.3d at 355–56.  Additionally, we consider
the cumulative effect of the trial court’s errors.  We are also cognizant that
a trial court’s overruling of a defendant’s objections puts a “stamp of
approval” on the prosecutor’s improper cross-examination or jury argument,
increasing the risk of harm.  See Lee v. State, 971 S.W.2d 130, 131
(Tex. App.—Houston [14th Dist.] 1998, pet. ref’d). 

            The evidence
of appellant’s guilt was not overwhelming.  Instead, the case was largely a “swearing
match” between appellant and the Balcerowiczes.  Therefore, credibility of the
witnesses played a crucial role.  

The
record contains evidence favoring the Balcerowiczes’ credibility and
evidence favoring appellant’s credibility.  Evidence concerning appellant’s
guns favored the Balcerowiczes’ credibility.  Raymond testified that, after
taking the first handgun from appellant and throwing it, he instructed Rebecca
to hide the gun.  Rebecca placed the first handgun, and later the second
handgun, by a nearby tree.  An investigating officer testified that Rebecca led
him to the handguns.  Appellant did not dispute this evidence and agreed on
cross-examination that it was possible Raymond had control of the first handgun
and could have used it.  Nevertheless, appellant testified he believed, based on
a statement made by Raymond, that Raymond intended to retrieve a weapon from
his truck.  The jury reasonably could have disbelieved appellant’s testimony
that he believed Raymond intended to retrieve a weapon; Raymond already had subdued
appellant, and Rebecca was in control of appellant’s first handgun.  In fact, the
prosecutor emphasized this point during argument.  Additionally, Raymond
testified he did not have any weapons in his truck, and an investigating
officer testified he searched for, but did not find, a firearm in Raymond’s
truck.

Evidence
regarding appellant’s knife also supported Raymond’s credibility.  Raymond
testified that, when Chevalier arrived, he asked her to take the knife from
appellant.  Chevalier corroborated this testimony.  In contrast, appellant
testified that he asked Chevalier to take the knife.  Additionally,
Raymond’s wounds corroborated his testimony that he was stabbed three times and
impeached appellant’s testimony that he stabbed Raymond once.

            Portions of evidence
also supported appellant’s credibility.  Appellant testified that he witnessed
Raymond rummaging through the glove compartment of his truck, presumably to
find a weapon.  Raymond testified that he did not remember opening the door of
his truck before he was shot.  However, Rebecca’s testimony that she saw
Raymond digging through his truck corresponds with appellant’s testimony.  

Additionally,
appellant’s credibility was strengthened by the blood evidence.  Blood was found
alongside the driver’s side, and on the ground near the tailgate, of appellant’s
truck.  Appellant testified that, after he retrieved the second gun from his
truck, he used the driver’s side of his truck to keep his balance.  According
to appellant, he was standing near the tailgate of his truck when he shot
Raymond, and the blood found on the ground near that area belonged to both men. 
An investigating officer testified that, to the rear of appellant’s truck, he
found an area on the ground where gravel had been moved and blood had pooled,
indicating an altercation occurred in that location.  During closing argument,
appellant’s counsel emphasized that the blood evidence was more consistent with
appellant’s testimony.[4] 


In sum,
there was evidence reinforcing the credibility of appellant and the Balcerowiczes. 
In light of the evidence, we next consider the nature of the errors.

Appellant
argues that “[t]he jury was much more likely to believe [Raymond] after
learning that he had never been convicted of a crime or in trouble with the
law—especially where defense counsel did not [and could not] elicit similar
testimony from [appellant.]”  We disagree.  “Because the lack of a criminal
record, even if true, is not particularly probative of the credibility of the
witnesses, the severity of the misconduct is not great.”  Jones v. State,
38 S.W.3d 793, 797 (Tex. App.—Houston [14th Dist.] 2001, pet. ref’d).  The
State did not emphasize Raymond’s lack of a criminal history during its questioning
of other witnesses or jury argument.  Thus, it is unlikely the jury’s decision
to believe Raymond turned on his clean record.[5] 


            Similarly,
the prosecutor’s improper argument implying that Raymond’s and Rebecca’s prior
statements paralleled their trial testimony was not significant.  We acknowledge
that the prosecutor concluded with this argument, meaning the jury received an
improper bolstering of the Balcerowiczes’ testimony immediately before
deliberating.  However, at most, this argument suggested that Raymond’s and
Rebecca’s story had not changed since the date of the altercation.

This case
differs from the situation we addressed in Ortiz v. State, 999 S.W.2d
600 (Tex. App.—Houston [14th Dist.] 1999, no pet.).  There, the arresting
officer, based on information provided by a confidential informant, entered a
house where he found the defendant and narcotics.  Id. at 602–03.  At
trial, two pages were redacted from a document admitted into evidence.  Id.
at 604.  During jury argument, the defendant argued that the arresting officer
lacked information regarding events in the house.  Id.  In rebuttal, the
prosecutor clearly argued matters outside the record by directing the jury to
the missing pages and implying that they contained information given by an
informant, which the jury should consider.  Id. at 604–05.  We reversed
the conviction because the defendant’s possession of the narcotics was in
question and the evidence of his guilt was “not overwhelming,” meaning the
prosecutor’s request that the jury speculate regarding the substance of the missing
information harmfully tied the defendant to the narcotics.  Id. at 606–07.   


Here,
the prosecutor’s improper argument did not refer to outside evidence supporting
elements of the charged offense; instead, it referred to outside evidence suggesting
the Balcerowiczes’ version of events remained consistent.  Furthermore,
immediately after improperly suggesting the substance of the statements, the
prosecutor argued, “Those statements are not in evidence but you can consider
everything that [Raymond and Rebecca] said on the stand as testimony.”  It is
unlikely the jury’s decision to believe Raymond and Rebecca turned on the consistency
of their stories (or even the consistency of their stories coupled with Raymond’s
lack of a criminal record).[6]

            In conclusion,
we have fair assurance that the errors did not have a substantial and injurious
effect or influence in determining the jury’s verdict, or had but a slight
effect.  Casey, 215 S.W.3d at 885; Johnson, 967 S.W.2d at 417.  We
overrule appellant’s second and third issues.

IV.   Assistance of Trial Counsel

            Finally, in
his fourth issue, appellant contends his counsel was ineffective by failing to
call character witnesses during the punishment phase.

            In reviewing ineffective
assistance claims, an appellant first must prove by a preponderance of the
evidence that his trial counsel’s representation was deficient because it fell
below the standard of prevailing professional norms.  See Salinas v. State,
163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (citing Strickland v. Washington,
466 U.S. 668 (1984)).  We begin with the strong presumption that counsel’s
actions and decisions were reasonably professional and motivated by sound trial
strategy.  Stults v. State, 23 S.W.3d 198, 208 (Tex. App.—Houston [14th
Dist.] 2000, pet. ref’d).  To overcome the presumption, the “allegation of
ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness.”  Thompson v. State,
9 S.W.3d 808, 814 (Tex. Crim. App. 1999) (quoting McFarland v. State,
928 S.W.2d 482, 500 (Tex. Crim. App. 1996)).

            During the punishment
phase, the parties stipulated that appellant had twenty-year-old misdemeanor
convictions for driving while intoxicated and unlawfully carrying a weapon. 
The State presented evidence regarding the severity of Raymond’s injuries. 
Appellant was the defense’s only witness.  He testified regarding his
pre-existing back condition and explained why probation was appropriate.  Trial
counsel attempted to call appellant’s wife as a witness, but decided not to
when the State pointed out that she had been in the courtroom during
appellant’s testimony.  The punishment range for appellant’s conviction was
between two and twenty years’ confinement, and the jury had the option to
recommend probation.  The jury sentenced appellant to five years’ confinement,
not probated.  

Appellant
filed a motion for new trial in which he argued trial counsel was ineffective
for failing to call character witnesses during the punishment phase.  Attached
to appellant’s motion were the affidavits of several witnesses who vouched for
appellant’s character.  At an evidentiary hearing on appellant’s motion, trial
counsel testified that he asked appellant multiple times to provide the names
of character witnesses, but appellant responded he “did not want to bring his
family into this.” According to counsel, appellant provided one character
witness whom appellant agreed did not need to be subpoenaed.  Two days before
the punishment trial, this witness stopped answering trial counsel’s phone
calls and ultimately did not testify.  Trial counsel agreed that character
witnesses may have been beneficial and admitted he did not document appellant’s
refusal to provide such witnesses.  Appellant disputed trial counsel’s
testimony and testified that counsel assured him character witnesses were
unnecessary.  The trial court denied appellant’s motion and expressed on the
record, “I make a finding that I believe the testimony of [trial counsel].”      

We conclude
appellant has not met his burden to establish that trial counsel’s performance
was deficient.  The trial court was free to believe trial counsel’s testimony
that appellant refused to provide character witnesses.  Additionally, appellant
did not show that counsel was ineffective by failing to subpoena the witness
who stopped answering his calls because we cannot foreclose the possibility the
witness was no longer willing to testify on appellant’s behalf.  Further,
although counsel admitted that character witnesses may have aided appellant, counsel’s
reasoning for not urging that appellant’s wife be allowed to testify during
punishment is not apparent on the record.  Counsel may have concluded that
testimony from appellant’s wife would have been duplicative of appellant’s
testimony and not efficacious, particularly because she had an obvious bias for
testifying favorably for appellant.  Accordingly, counsel’s alleged ineffectiveness
is not “firmly founded in the record.”  See Thompson, 9 S.W.3d at 814
(quoting McFarland, 928 S.W.2d at 500).  Appellant’s fourth issue is
overruled.

We
affirm the trial court’s judgment.       

 

                                                                                    

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

 

 

Panel consists of Justices Seymore,
Boyce, and Christopher.

 

Do Not Publish — Tex. R. App. P. 47.2(b).









[1]
In contrast, Rebecca testified it was not windy that day.





[2] A party may present information about a witness’s
background to enable the jury better to evaluate the witness’s credibility and
assess the weight to give his testimony.  Williams v. State, 604 S.W.2d
146, 149 (Tex. Crim. App. 1980); Johnson v. State, 932 S.W.2d 116,
118 (Tex. App.—Houston [1st Dist.] 1996, no pet.).  





[3]
“Reputation evidence as to the character of a party’s own witness for
truthfulness” is admissible “after the witness’s character for truthfulness has
already been attacked by the opposing party.”  Rivas v. State,
275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (citing Tex. R. Evid. 608(a)).





[4]
The blood evidence was not necessarily inconsistent with the Balcerowiczes’
testimony.  Raymond testified that he was shot when standing in between his
truck and his friend’s truck, not when he was near the tailgate of appellant’s
truck.  However, Raymond also testified that, after he tackled appellant the
second time, he dragged appellant back by appellant’s truck, although Raymond
did not indicate where in relation to appellant’s truck.  Rebecca testified
that Raymond was shot when he was walking in the direction of appellant’s truck
and she found the men fighting on the ground behind a truck, although it is
unclear from the record which truck.  A responding officer testified that, when
he arrived, he saw the men lying on the ground behind appellant’s truck where
blood was found.  Additionally, we note that a bullet casing was located nearer
to the front of Raymond’s truck, although the importance of this fact was
lessened by an investigating officer who agreed that a casing may travel some
distance when ejected from a gun.





[5]
In Tweedle v. State, the Court of Criminal Appeals reversed the
defendant’s conviction because the State improperly bolstered an important
witness’s credibility, including by eliciting testimony that the witness had
never been charged with a criminal offense.  153 Tex. Crim. 200, 203–04, 218
S.W.2d 846, 849 (1949) (per curiam), disapproved of by Elam v. State,
518 S.W.2d 367, 369 & n.1 (Tex. Crim. App. 1975) (holding that questions
designed to elicit a witness’s background information are proper, but noting
that the criminal-history question in Tweedle was improper).  However, Tweedle
was decided before adoption of Texas Rule of Appellate Procedure 44.2(b), which
changed the harm analysis for nonconstitutional errors.  Thus, Tweedle
does not control.





[6]
In Spriggs v. State, the Court of Criminal Appeals held harmful the
prosecutor’s argument that an important witness’s prior statement (which was
not admitted) was consistent with his testimony.  160 Tex. Crim. 188, 189, 268
S.W.2d 191, 192 (1954).  Admittedly, this is precisely our situation. 
Nevertheless, Spriggs was decided before the adoption of Texas Rule of
Appellate Procedure 44.2(b).  Thus, Spriggs does not control our
analysis here.