**AFFIRMED as MODIFIED and Opinion Filed August 3, 2021**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-18-01092-CR

**KENNETH WATTS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F17-76274-R**

## MEMORANDUM OPINION ON REMAND

Before Justices Molberg, Reichek, and Goldstein[1]
Opinion by Justice Reichek

A jury convicted Kenneth Watts of murder and assessed punishment at nineteen years in prison. In two issues on original submission, he challenged both the sufficiency of the evidence to sustain his conviction and the constitutionality of a portion of a time payment fee. This Court overruled the sufficiency complaint but sustained appellant's issue related to the time payment fee, deleted it from the trial court's judgment, and affirmed the judgment as modified. *Watts v. State*, No. 05-

---

[1] Justice David Evans was a member of the original panel; however, as of January 1, 2021, he was replaced by Justice Bonnie Goldstein.

18-01092-CR, 2020 WL 400174, at *1 (Tex. App.—Dallas Jan. 23, 2020) (mem. op., not designated for publication).

The State filed a petition for discretionary review with the court of criminal appeals, challenging our constitutional analysis. Thereafter, the court of criminal appeals handed down its opinion in *Dulin v. State*, 620 S.W.3d 129 (Tex. Crim. App. 2021), and held that the time payment fee was assessed prematurely because the pendency of the appeal suspends the obligation to pay court costs. Consequently, the court refused the State's petition in this case and instead granted review on its own motion on the issue of whether the time payment fee should be struck as prematurely assessed. In light of its *Dulin* decision, the court vacated our judgment and remanded the case. *Watts v. State*, No. PD-0170-20, 2021 WL 1938700, at *1 (Tex. Crim. App. May 12, 2021) (per curiam) (not designated for publication).

We again overrule appellant's issue challenging the sufficiency of the evidence. In light of *Dulin*, we strike the time payment fee as prematurely assessed. We modify the trial court's judgment and affirm as modified.

FACTUAL BACKGROUND

On the night of August 26, 2017, appellant fatally shot Christopher Meredith in the head with an AK-47 assault rifle. Meredith was driving a car in a shopping center parking lot at the time. Appellant claimed that he feared Meredith was about to run him over, and he shot Meredith to protect himself. To prove appellant murdered Meredith, the State relied primarily on the testimony of two eyewitnesses,

–2–

Jenita Busbey and Leroy Broadway, as well as video evidence depicting what occurred before and after the shooting, but not the shooting itself. Busbey and Meredith previously dated and had a child together; Broadway was an acquaintance from whom Meredith had previously purchased drugs.

On the night of the incident, Meredith drove Busbey's car to pick her up from work. Meredith then drove them to a gas station located in a shopping center in East Dallas to buy $20 worth of marijuana. When they arrived shortly before 11 p.m., some fifteen to twenty people were hanging out in the parking lot. Meredith saw appellant and initially purchased the marijuana from him. But right after he made the buy, Meredith saw Broadway and decided that he wanted to purchase the marijuana from him. Meredith went to get his money back from appellant. Appellant agreed, but slapped Meredith with the money as he returned it. The slap angered Meredith, who took it as a sign of disrespect.

Meredith went to the trunk of his car, opened it, and briefly appeared to be looking for something as he argued with appellant. Although appellant initially believed Meredith was looking for a gun, he never saw Meredith with one. Meredith closed the trunk and got into his car to leave before suddenly getting out again. Appellant and his co-defendant, Jerrick Chism, walked over to Meredith, and Chism hit Meredith in the head. Both men then repeatedly punched and kicked Meredith several times, knocking him into the driver's seat of the car, where they continued to beat him.

–3–

Busbey, who was in the front passenger seat, got out of the car when Chism reached in and appeared to take her car keys from the ignition. She confronted Chism, who knocked her to the ground. After several seconds, appellant and Chism walked away. Busbey said Meredith was "pretty upset" and drove around the parking lot a couple of times looking for appellant and Chism. At one point, they saw appellant. Ultimately, she was able to convince Meredith to leave. Busbey said Meredith was yelling and cursing during the incident, but she never heard him threaten to kill anyone.

Shortly after they left, Busbey discovered that her purse and phone were missing. She and Meredith presumed it was taken by appellant or Chism during the fight. Busbey said the keys to her home and work were in her purse, and she needed them. They immediately returned to the shopping center. Surveillance video showed that they arrived at 11:07 p.m. Busbey said she got out of the car to look for her purse and found it on the ground in a dark corner of the parking lot. Its contents had been dumped and, in picking them up, she noticed her phone and keys were missing. She was able to retrieve her phone from one of the many people hanging out on the parking lot that night, but she never found her keys. Surveillance video showed Busbey with her purse walking across the parking lot at 11:09 p.m.

During this time, appellant was driving erratically around the parking lot looking for the two men who beat him. After Busbey got back into the car, she saw appellant, who walked in front of their car. Meredith and appellant continued to yell

–4–

at each other. According to Busbey, Meredith was still "really mad" and wanted to fight them. Once appellant moved out of the way, Meredith drove erratically around the parking lot, making a "couple more donuts." As the car rounded a parking lot median and was facing the store fronts, Busbey saw appellant and Chism standing next to each other in front of the darkened windows of one of the stores. She immediately noticed they had weapons—appellant had an assault rifle and Chism had a pistol—and told Meredith. Busbey testified that when Meredith saw that the men were armed and "were about to shoot us," he started to drive at a high rate of speed to "get us out of there." She heard four or five gunshots and then woke up in the car inside of one of the closed stores, Henderson's Chicken. It was dark, but she could see that Meredith's face was bloody and he was "jerking." Appellant and Chism were captured on video at 11:11 p.m. running from the scene.

Busbey squeezed out of the car and ran to a police officer. She said she was "scared" and in "disbelief" over what had happened. After talking to the police, she was taken to the hospital, where she learned that Meredith would not survive his injuries. Busbey said appellant did not have a gun that night and she never heard him threaten to kill anyone. She acknowledged, however, that Meredith was very angry "from the moment they jumped him" and wanted to fight them.

On cross-examination, Busbey dismissed the idea that Meredith returned to the shopping center parking lot that night simply to look for his assailants. She said they returned to get her belongings, although she said she was sure "it infuriated

[Meredith] more that they stole my property." She also agreed that at the moment she saw that appellant and Chism had weapons, her car was pointed directly at them. But she also testified that if Meredith had wanted to run over appellant, he could have done so when appellant walked in front of their car just before the shooting. She said Meredith was not trying to run over anyone that night. Moreover, she did not believe Meredith would have wrecked her car "just to run over two individuals through a glass building."

Broadway was subpoenaed by the State but was a reluctant witness who said he was scared to testify and did not remember the events of that night. Initially, he responded to each question with either he did not know, did not remember, or did not recall. After a break in the proceedings, appellant acknowledged that he was on the surveillance video of the scene that night and that he had talked to Detective Esteban Montenegro, the investigator on the case. He also said he watched the video of his interview and remembered giving a statement.

Broadway testified that he was the person that took Busbey's purse that night because, once the fight broke out, he wanted to get his marijuana back. He testified that after the fight, Meredith tried to run over appellant, was "deranged," was driving erratically, and was about to hit other people. When Meredith returned to the parking lot after leaving, he was still upset and was ranting, raving, and hollering at appellant and Chism. According to Broadway, appellant said he "wanted to kill them," was "going to try to kill them," and was "going to get them, you know, going to do

something bad to them." Broadway said he did not remember telling Detective Montenegro that appellant and Chism shot Meredith while he was walking to his car. He acknowledged hearing that statement on the video, but said he did not remember what actually happened because he was "highly intoxicated" that night.

Montenegro, the investigating detective, obtained outside surveillance video from a convenience store where the events began. Based on that video, he was ultimately able to identify the two shooters. The video, which showed the drug transaction and events that led to the physical fight, was offered into evidence and was used during the testimonies of Busbey, Broadway, Montenegro, and appellant to explain the events.

As part of his investigation, Montenegro interviewed both Busbey and Broadway. Busbey was "all over the place," but both said Meredith was angry and "acting crazy" that night and should have left the scene. But Montenegro said that Meredith being out of control did not warrant him getting shot. He did not remember Busbey telling him that Meredith was driving the car towards the shooters when the shots were filed; rather, Busbey told him they drove around the parking lot a couple of times and as they came around the corner, she saw the men holding guns and they opened fired. Although there were many people at the scene that night, none of them came forward with any information. He was not able to find any other independent witness who actually saw the incident.

Crime scene analysts photographed the scene and collected two fired cartridge casings stamped Tulammo 7.62x39, four fired cartridge case heads stamped R-P 40 S&W, and two fired bullet fragments. The "40s" were found on the sidewalk, and the 7.62s were found in the parking lot close to the sidewalk. The distance from the median to the sidewalk was more than 54 feet. A firearms and tool mark expert testified that the 7.62s came from an AK-47/SKS-type of semi-automatic rifle and had been fired by the same firearm. The four 40 S&W cartridge casings were fired from the same .40-caliber firearm, likely a Smith and Wesson M&P series pistol.

In addition, Busbey's car was processed, and it appeared that only one projectile went through the vehicle. The bullet appeared to go through the front driver's side windshield and through part of the vinyl sun visor. A fired bullet/shredded jacket was found in the left rear seat. The projectile looked like it came from a rifle.

Appellant testified he was selling marijuana that night when Meredith drove up and asked to buy some. After he sold marijuana to him, Meredith came back and accused appellant of selling him some "bunk ass weed." He gave Meredith his money back and watched Meredith do a "transaction" with Broadway. He denied slapping Meredith with the money. Meredith was in his car and was leaving when he suddenly stopped, got out of the car, and "acted like he had a weapon in his trunk." According to appellant, Meredith kept saying, "You just don't know who you fucking with." Appellant said Meredith was "aggressive," and appellant thought he

–8–

had a weapon. Appellant said he asked Meredith if he was going to shoot him over $20, and appellant said, "You don't know who you fucking with. I live right down the street. I'll be back." At one point, Meredith had his hand up in the air, which appellant said meant that "he's fix'in to get his shit."

Meredith started to leave, but again, stopped and got out of the car. Appellant said he could tell that Meredith did not have a weapon and felt "comfortable" approaching him to ask "what the problem was." Chism also walked up, although appellant said he was not involved in the transaction and he did not ask him to get involved. Appellant said Meredith threatened to "fuck" them up and "pop" both of them. At that point, Chism hit Meredith, and the fight broke out. When the fight ended, appellant said Meredith tried to run them over with his car. He said Meredith drove the car over the curb and was chasing them. Appellant said he ran into a smoke shop, which was three or four doors down from the Henderson's Chicken. Appellant said he stayed in the smoke shop while appellant circled the parking lot. A friend, who he said has since died, came into the store and told him he had a gun in his car if he needed it. At one point, appellant peeked out of the shop to leave, but saw Meredith circling the parking lot again and "backed up."

When appellant decided to leave the smoke shop, he heard "a lot of commotion" coming from Meredith. He said he could hear Meredith asking, "Where them n——? I'm fix'in to kill them." Appellant said he took the threat seriously. He went to his "homeboy's car" and got the gun because he was "thinking about what

–9–

[Meredith] said." As he was walking toward the commotion, he said he saw Meredith and Meredith saw him. He testified that Meredith drove the car "full speed directly" at him, and appellant said he feared for his life. He said he did not know if Meredith had a gun or if he was about to run him over with his car. So, appellant said, he fired two shots at Meredith's car and then ran.

On cross-examination, appellant acknowledged that he and Meredith were yelling at each other over the course of the incident, but he denied ever making any threatening statements. He also knew that when Meredith closed his trunk, he did not have a gun. He admitted—and the video evidence showed—that he and Chism beat Meredith and were going at it "hard." He also acknowledged that the smoke shop was a "safe place" for him after the fight.

As for the events that occurred after Meredith returned, he denied Busbey's account that he had an encounter with Meredith right before the shooting in which he was standing in front of the car while he and Meredith yelled at each other. In addition, the State questioned him about why he would leave his "safe place" when he claimed to hear Meredith threatening to kill him. He said he heard the threat from a distance away in the parking lot, but instead of returning to the smoke shop, he went and got the AK-47 assault rifle, which he acknowledged was a "pretty hefty weapon to handle," and began walking in the direction of the commotion. As for Chism's involvement, he said it was a "matter of pure coincidence" that Chism also

–10–

got a weapon and walked to the exact position as appellant, aimed in the exact direction, and shot at the exact same time. He said the shooting was not planned.

After hearing the evidence, the jury rejected appellant's claim of self-defense and convicted him of murder. This appeal ensued.

SELF-DEFENSE

In his first issue, appellant argues the evidence is insufficient to support the conviction because no rational factfinder could have found against him on his claim of self-defense. In particular, he argues his belief that deadly force was immediately necessary to protect him against Meredith's use or attempted use of deadly force was reasonable under the circumstances.

**1. Law of Self-Defense**

As charged here, a person commits murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2). A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *Id*. § 9.31(a). Under section 9.31, the use of force against another is not justified in response to verbal provocation alone. *Id*. § 9.31(b)(1). A person is justified in using deadly force against another (1) if he would be justified in using force against another under section 9.31 and (2) when and to the degree he

–11–

reasonably believes deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id*. § 9.32(a). "Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury). TEX. PENAL CODE ANN. § 9.01(3). "Reasonable belief" means a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. *Id*. § 1.07(a)(42).

An actor is not required to retreat before using deadly force if he has a right to be present at the location where the deadly force is used, he has not provoked the person against whom the deadly force is used, and he is not engaged in criminal activity at the time deadly force is used. *Id*. § 9.32(c). In determining whether the actor reasonably believed that the use of force was necessary, the fact finder may not consider whether the actor failed to retreat. *Id*. § 9.32(d).

**2. General Principles Governing Legal Sufficiency Review**

In reviewing the sufficiency of the evidence to support a criminal conviction, we examine the evidence in the light most favorable to the verdict to determine whether any rational jury could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018). This standard, which applies equally to both direct and circumstantial evidence cases, accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to

–12–

draw reasonable inferences from basic to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). On review, this Court considers whether the necessary inferences made by the trier of fact are reasonable, based on the cumulative force of all the evidence. *Braughton*, 569 S.W.3d at 608. We do not engage in a "divide-and-conquer" analysis, separating each piece of evidence offered to support an appellant's conviction, followed by speculation on the evidence the State did not present. *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Braughton*, 569 S.W.3d at 608.

When performing our review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the jury. *Id*. "Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.'" *Braughton*, 569 S.W.3d at 608 (quoting *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574, (1985)). But juries are not permitted to come to conclusions based on "mere speculation or factually unsupported inferences or presumptions." *Id*.

### 3. Conducting Sufficiency Review for Self-Defense Claim

The issue of self-defense is a fact issue to be determined by the jury. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). The defendant has the initial burden of producing evidence to raise self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton*, 804 S.W.2d at 914. If the defendant produces some evidence, the State has the burden of persuasion to disprove the raised defense. *Zuliani*, 97 S.W.3d at 594. The State is not obligated to offer evidence refuting a claim of self-defense; rather, the State is required to prove its case beyond a reasonable doubt. *Id*. Thus, when an appellant challenges the sufficiency of the evidence to support the rejection of a self-defense claim, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914. If a jury finds the defendant guilty, then it implicitly finds against the defensive theory. *Zuliani*, 97 S.W.3d at 594.

### 4. Analysis

Appellant argues the evidence demonstrated that he acted reasonably in shooting Meredith to protect himself from Meredith's use or attempted use of unlawful deadly force. He argues that Meredith's verbal threats, coupled with his "erratic, angry, and upset driving directly towards" appellant, shaped appellant's

reasonable belief that defensive action was immediately necessary to protect against being run over by Meredith. He directs us to his testimony that Meredith (1) told appellant he didn't know who he was "fucking with," (2) said he was going to "fuck" them up and "pop" both of them, and (3) said he was "fix'in to kill them." He argues that the fight had been over for several minutes and Meredith became the aggressor when he returned to the parking lot to "hunt" him down and attempt to "run him over." Finally, he also argues that he had no duty to retreat because (1) he had a right to be on the parking lot, (2) he did not provoke Meredith at the time Meredith "accelerated the vehicle directly towards [him" and had not threatened him that night, and (3) he was not engaged in any criminal activity at the time Meredith "accelerated the car."

Although the jury heard evidence favorable to appellant, they also heard from Busbey and were able to view the video of events before the shooting. Although she acknowledged Meredith was very angry that night after appellant and Chism beat him and had driven erratically around the parking lot, she denied ever hearing Meredith threaten to kill anyone. She said he did not have a gun, and she also made it clear to Detective Montenegro that Meredith did not use his car as a weapon that night. As she explained, if Meredith had wanted to run over appellant, he had the opportunity just before the shooting and did not do it.

As Busbey testified about the actual shooting, she used photographs from the scene to explain to jurors where she and Meredith were in relation to appellant and

–15–

Chism. She said Meredith twice circled a median depicted in State's Exhibit 6 and, on the second trip, she immediately saw appellant and Chism. Appellant was holding an AK-47 rifle and Chism had a black pistol. Busbey's car, as it came around the corner, was positioned facing them. Busbey testified that when Meredith saw that appellant and Chism were about to shoot them, he "started driving at a high rate of speed" to "get out of there." The distance from the median to the sidewalk was more than fifty-four feet. One shot went through the windshield and struck Meredith in the head.

Even under appellant's version of events, the jury could have determined he did not act in self-defense that night. Appellant admitted he was in a safe place, the smoke shop, after the fight. But, he said, he came out of the shop and claimed to hear appellant making verbal threats about him. In response, he walked to a car in the parking lot, grabbed an AK-47 rifle from it, and then headed in the direction of the alleged threat. From this, the jury could have determined appellant was not acting reasonably but was acting on what he perceived to be a future threat by immediately shooting Meredith. Although he claimed that the shooting was not planned and that he and Chism ended up in the same place, with weapons, by coincidence, the jury could have concluded otherwise. Finally, after firing into the car, appellant ran off, hid in an apartment complex, and got rid of the gun by returning it to his friend. The jury could have believed this evidence showed appellant's consciousness of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex.

Crim. App. 2000) (recognizing, in sufficiency review, jury may consider evidence showing consciousness of guilt); *Martin v. State*, 151 S.W.3d 236, 245 & n.8 (Tex. App.—Texarkana 2004, pet. ref'd) (defendant's consciousness of guilt shown by his flight from scene of shooting in murder case where defendant claimed self-defense).

In sum, the jury viewed the video recording, listened to the witnesses, and considered the witnesses' demeanor and credibility before rejecting appellant's claim that he acted in self-defense that night and finding that he either (1) intentionally or knowingly caused Meredith's death or (2) committed an act clearly dangerous to human life. Given the evidence, we conclude the jury acted reasonably in doing so. Viewing the evidence in the light most favorable to the verdict, and deferring to the jury's determinations regarding conflicts in the testimony and credibility of the witnesses, we conclude a rational jury would have found the essential elements of murder were proved beyond a reasonable doubt and also would have found against appellant on his defensive claim of self-defense. Accordingly, we overrule the first issue.

TIME PAYMENT FEE

In his second issue, appellant contends a portion of a $25 time payment fee assessed as part of the court costs in this case under section 133.103 of the Local Government Code is facially unconstitutional.

The judgment in this case imposed court costs in the amount of $339. Based on the record, this amount necessarily includes the $25 time payment fee. The

certified bill of costs assessed court costs in the amount of $314 and included language that a $25 time payment fee would be assessed in accordance with section 133.103 of the government code "for any fines and or court costs remaining on or after the 31st day from the date of the judgment assessing the fine and or court cost." A subsequent Criminal Court Fee Docket reflects that the $25 time payment fee was assessed on October 15, 2018, twenty-eight days after judgment, for an adjusted balance of $339.

In *Dulin*, the court of criminal appeals determined that "[t]he pendency of appeal stops the clock for purposes of the time payment fee" and that, as a result, the assessment of time payment fees is premature. 620 S.W.3d at 133. Therefore, in accordance with *Dulin*, we conclude the $25 time payment fee should be struck in its entirety as prematurely assessed.

We modify the trial court's judgment by deleting the $25 time payment fee to reflect total costs of $314.00, without prejudice to a time payment fee being assessed later "if, more than 30 days after the issuance of the appellate mandate, [appellant] has failed to completely pay any fine, court costs, or restitution that he owes." *See id.* at 133 & n.29.

We affirm the judgment as modified.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
181092F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

KENNETH WATTS, Appellant

No. 05-18-01092-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial District Court, Dallas County, Texas Trial Court Cause No. F17-76274-R. Opinion delivered by Justice Reichek; Justices Molberg and Goldstein participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reduce the total amount of court costs by $25 to strike the time payment fee.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered August 3, 2021