COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| AURELIANO SANCHEZ GALVAN, | § | No. 08-23-00162-CR |
| Appellant, | § | Appeal from the |
| v. | § | 327th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2021D01588) |

## MEMORANDUM OPINION

A jury found Appellant Aureliano Sanchez Galvan guilty of continuous sexual abuse of a child under fourteen years of age. In three issues on appeal, Appellant challenges the trial court's evidentiary rulings. In a fourth issue, he asserts the trial court erred by denying his request for a jury shuffle. In his final issue, Appellant asserts the cumulative harm of the trial court's errors affected his substantial rights. For the reasons set forth below, we affirm the trial court's judgment.

## BRIEF BACKGROUND

D.M.[1], the minor complainant in this case, complained that Appellant sexually abused her over the span of multiple years at two different homes in which D.M. resided over time. D.M.

---

[1] To protect a child's identity, we refer to the child by initials rather than by name. *See* Tex. R. App. P. 9.10.

alleged that Appellant, who was in a relationship with D.M.'s aunt, would visit D.M.'s home, ask to take a shower, then enter into whatever bedroom D.M. was in and sexually assault her. In addition to D.M.'s testimony, the jury heard from several witnesses, including D.M.'s mother, law enforcement officers, and witnesses who testified about extraneous offenses involving Appellant and two other young girls. The jury also heard a recording of a jail call between Appellant and his wife. Because Appellant does not raise an issue regarding the sufficiency of the evidence to support his conviction, we do not discuss the facts in greater detail. Additional facts necessary for disposition of his appellate issues are recited in the relevant analysis of each issue below. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## TESTIMONY OF OUTCRY WITNESSES

In his first issue, Appellant asserts the trial court erred by allowing two witnesses (the complainant's mother and Detective Smith) to testify as outcry witnesses. The State contends Appellant did not preserve this issue for our review.

### A. Error preservation

The State argues that to preserve error on the ground that a witness improperly testified as an outcry witness, Appellant was required to timely and specifically object and, unless allowed a running objection, must continue to object each time the witness offers the improper outcry testimony. *Beckham v. State*, 29 S.W.3d 148, 153-54 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *see also Johnson v. State*, No. 08-05-00012-CR, 2006 WL 2635380, at *4 (Tex. App.—El Paso Sept. 14, 2006, pet. ref'd) (not designated for publication) (holding same); Tex. R. App. P. 33.1 (requiring timely objection to trial court).

2

### (1) Background

The trial court conducted a pretrial outcry hearing at which the State presented the testimony of Aurora (the complainant's mother) and Detective Smith. After their testimony, defense counsel argued the State did not satisfy its burden to prove that Aurora and Detective Smith "were the first adults to whom the child . . . described the incident that happened[.]" More specifically, defense counsel asserted that neither Aurora nor Detective Smith could pinpoint the specific event to which they were the outcry witness. The trial court found both witnesses reliable and allowed them to testify as outcry witnesses at trial. On the morning of trial, Appellant filed a motion to reconsider and a renewed objection to the designation of Aurora and Detective Smith as outcry witnesses. After opening statements, the trial court heard the renewed objection but did not alter its ruling. When called as witnesses before the jury, both Aurora and Detective Smith testified about what they were told by D.M.

The complainant, D.M., testified the sexual abuse began when she was approximately six or seven years old.[2] In 2020, D.M. made her first statement to her mother, Aurora, who immediately called the police. D.M. was interviewed by Detective Claudia Azar at the police station.[3] Later, Detective Lourdes Smith was assigned the case and she also interviewed D.M. The State gave notice of its intent to call outcry witnesses under seal and the document is not included in the record on appeal. However, on appeal, Appellant does not contend he was unaware of the State's intention to call Aurora and Detective Smith as outcry witnesses at trial.

---

[2] D.M. was born on November 21, 2005. Trial commenced in early 2023.

[3] Detective Azar was a patrol officer when D.M. gave her statement at the police station. By the time of trial, she was a detective.

### (2) Analysis

Texas Rule of Evidence 103(b) provides that "[w]hen the court hears a party's objections outside the presence of the jury and rules that evidence is admissible, a party need not renew an objection to preserve a claim of error for appeal." Tex. R. Evid. 103(b); *see also Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008) (holding that to preserve error "an objection must be made each time inadmissible evidence is offered unless the complaining party obtains a running objection or obtains a ruling on his complaint in a hearing outside the presence of the jury"). Here, Appellant raised his objections to Aurora and Detective Smith before trial and obtained a ruling denying his objections. Therefore, we conclude that he preserved his complaint for our review. Accordingly, we address the merits of his complaint.

### B. Proper outcry witness

Texas Code of Criminal Procedure Article 38.072 "creates a statutory exception to the hearsay rule and allows the first adult to whom a child makes a statement describing a sexual assault to testify to the child's outcry, if the statute's provisions are met." *In re C.E.S.*, 400 S.W.3d 187, 192 (Tex. App.—El Paso 2013, no pet.); *see also* Tex. Code Crim. Proc. Ann. art. 38.072 (Hearsay Statements of Certain Abuse Victims). "Procedurally, the State cannot introduce the statement until the trial court holds a hearing outside the presence of the jury to determine whether the statement is reliable based on the time, content, and circumstances of the statement." *Kappes v. State*, No. 08-22-00095-CR, 2023 WL 1972015, at *4 (Tex. App.—El Paso Feb. 13, 2023, pet. ref'd.); *see* Tex. Code Crim. Proc. Ann. art. 38.072, § 2-a(b)(2). "We review a trial court's determination of whether an outcry statement is admissible under Article 38.072 for an abuse of discretion." *Kappes*, 2023 WL 1972015, at *4.

"The proper outcry witness is not the first adult to whom the child made the outcry, but instead the first adult to whom the child described the abuse in some discernible way." *C.E.S.*, 400 S.W.3d at 192. The child's outcry "must be more than words which give a general allusion that something in the area of child abuse was going on." *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990) (en banc).

> In picking the particular wording of the "first person" requirement, the legislature was obviously striking a balance between the general prohibition against hearsay and the specific societal desire to curb the sexual abuse of children. . . . The portion of the statute catering to the hearsay prohibition demands that only the first person is allowed to testify. But the societal interest in curbing child abuse would hardly be served if all that first person had to testify to was a general allegation from the child that something in the area of child abuse was going on at home. Thus . . . any statement that arguably relates to what later evolves into an allegation of child abuse against a particular person will [not] satisfy the requisites of [Article 38.07].

*Id*. To be the outcry witness, the victim must have described the offense to that witness. *Id.* In other words, "the specificity requirement is generally met when a victim sufficiently describes the how, when, and where of the abuse." *Kappes*, 2023 WL 1972015, at *5 (citation omitted).

**(1) Aurora's testimony**

Appellant asserts the trial court erred by allowing Aurora to testify as an outcry witness because the statement D.M. made to Aurora was too vague to qualify as a "statement about the offense."

During Aurora's direct examination, she was asked by the State about the day D.M. made her statement:

Q. What happens to [D.M.] when she does something she's not supposed to and she gets punished? What's her punishment?

A. I don't let her go out, and I take her cell phone away.

Q. Now, when you asked her if she had done her chores, what did she say?

A. That she had done it, but that I was asking her to do too much.

Q. What happened next?

A. I spoke to her strongly, and that's when she told me what had happened to her. She told me that I did not understand her.

Q. What did you observe in her behavior when she was telling you that?

A. She would cry.

Q. What did you say in response?

A. I just asked her why she had not told me about this, and I hugged her.

Q. What did she tell you in detail, please?

A. That she was afraid to tell me because he had told her not to tell anybody because I did not have my residence and I could be deported.

Q. What did [D.M.] tell you the defendant did to her?

A. I'm sorry. I did not understand the word.

Q. It's okay. *What did [D.M.] tell you that the defendant did to her?* [Emphasis added]

A. She has not wanted to tell me. *She just told me that he had – he had violated her, but that was it.* [Emphasis added]

Q. And what was your reaction when she told you that he had violated her?

A. I felt impotent.

.      .      .

Q. After [D.M.] told you this, what did you do?

A. Support her, be with her.

Q. And you said earlier you went to the police?

A. Yes. We went to file a complaint.

6

On cross-examination, Aurora was asked about the statement she gave to Detective Smith: "you stated that [D.M.] told you that [Appellant] had raped her when she was 6 or 7 years old." Aurora replied, "yes." The statement itself was not admitted into evidence.

D.M.'s comments to Aurora did not include specific details; she did not describe the "how, when, and where" of the abuse. *Calderon v. Texas*, 2021 WL 5027754 (Tex. App.—El Paso 2021, pet. ref'd) (not designated for publication); *see also Smith v. State*, 131 S.W.3d 928, 931 (Tex. App.—Eastland 2004, pet. ref'd) (concluding that "child's statement to his mother that [Appellant] had been performing oral sex on him did not relay any specific details about the charged offense").[4] Therefore, we conclude the trial court erred by allowing Aurora to testify as an outcry witness.

### (2) Appellant's renewed objection to Detective Smith's testimony

Only Aurora and Detective Smith testified at the pretrial outcry hearing. On the morning of trial, Appellant filed a motion to reconsider and a renewed objection to the designation of Aurora and Detective Smith as outcry witnesses. In his renewed objection to both Aurora and Detective Smith, Appellant stated as follows:

> During the course of trial preparation, it became apparent to defense counsel that D.M. gave a lengthy interview about her alleged sexual abuse to the first police officers she encountered, El Paso Police Officers Claudia Azar (3245) and Dominique Lopez (3409), on August 30, 2020. . . . This occurred when [Aurora] did a walk-in report at the Pebble Hills Regional Command Center and they spoke to patrol officers. Wherefore, [defense counsel] respectfully renews his objection to the State's designation of Detective Lourdes Smith as an appropriate outcry witness and that any statements made to Detective Smith by D.M. only be allowed for impeachment purposes and not substantive evidence under article 38.072.

---

[4] During opening statements, defense counsel alluded to the outcry to Aurora by telling the jury that D.M. told her mother, "I've been sexually assaulted by [Appellant]." On appeal, the State contends this opening statement "opened the door" to Aurora's testimony; therefore, the trial court did not err by allowing her to testify as an outcry witness. We disagree. Prior to appellant's opening statement, the trial court had already ruled Aurora to be reliable and allowed her to testify as an outcry witness at trial.

The trial court considered the objection but did not alter its ruling. On appeal, Appellant asserts the trial court erred by allowing Detective Smith to testify as an outcry witness because the offenses D.M. reported to Detective Smith were not separate and distinct from the offenses D.M. previously reported to Detective Azar.

"Outcry testimony is event-specific not person-specific and, as such, multiple outcry witnesses may testify when the outcry statements are about different events and not a repetition of the same events." *C.E.S.*, 400 S.W.3d at 192; *see also Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) ("Hearsay testimony from more than one outcry witness may be admissible under article 38.072 only if the witnesses testify about different events. There may be only one outcry witness per event."). "If the child victim first described one type of abuse to one outcry witness, and first described a different type of abuse to a second outcry witness, the second witness could testify about the different instance of abuse." *Tear v. State*, 74 S.W.3d 555, 559 (Tex. App.—Dallas 2002, pet. ref'd). Therefore, we compare the trial testimony of Detective Azar to that of Detective Smith to determine whether the trial court abused its discretion by allowing Detective Smith and Detective Azar to testify about D.M.'s statements.[5]

### (3) Detective Azar's testimony

On August 30, 2020, Detective Claudia Azar was a patrol officer when she met with D.M. and Aurora at the police station on the day they came to report the assault. Detective Azar testified D.M. told her the following:

> So what she told us was they lived at 426 Pendale with her mother and her siblings. [Appellant] is her aunt's spouse. So he would often go visit them and would ask to take a shower. So they were comfortable to let him take a shower at their residence. So she stated that the first time, she was asleep in her mother's bedroom and, when

---

[5] Detective Azar's written statement was neither admitted into evidence when Appellant renewed his objection to Detective Smith's testimony nor when Detective Azar testified at trial. Therefore, for the purpose of our analysis, we compare the trial testimony of both detectives.

she woke up, he was standing next to her with a T-shirt on, exposing his genitals. At that time he tried to take off her clothes. She told him no and tried to stop him by kicking him. And then he ended up mounting her and was able to take off her clothes and put his erect penis into her. She told us that this happened about five to six times . . . for about two years.

.        .        .

Then they moved to 12341 Tierra Inca. Two years after they moved to Tierra Inca, he ended up visiting them. Again, she was–he asked to take a shower. She was in the–in Mother's room, and he attempted again to try and assault her, but she–she was able to kick him off, so he was unsuccessful. She stated that it happened another time at the same residence at Tierra Inca but was unsuccessful that time as well.

Detective Azar said that when she was first dispatched, it was for the offense of indecency with a child, but after speaking with D.M., she classified the offense as sexual assault.

On cross-examination, Detective Azar said D.M. told her the abuse started when she was nine years old when she lived in a house located at 426 Pendale. D.M. told her that Appellant "covered her mouth and grabbed her legs," "he was able to stick his penis inside of her," and this "happened five or six times." D.M. did not tell Detective Azar that Appellant touched her with his hand. D.M. told Detective Azar that Appellant tried twice to take off her clothing and sexually assault her when she lived at the Tierra Inca house, but she was able to fight him off.

### (4) Detective Smith's testimony

Detective Lourdes Smith testified she was assigned the aggravated sexual assault case on August 31, 2020, and she met with D.M. on September 10, 2020. Detective Smith testified D.M. told her the following:

The first time that she told me something happened, she said that she was 9 years old. [Appellant] used to go shower at their house, and he used to use the same–the restroom that was inside of her mom's room, which she would fall asleep in. And she said that the first time that it ever happened, she was asleep in there and he had taken a shower. He came out, and she woke up to him exposing himself, his penis. And then she said she got up from the bed because she was scared and he put her back on the bed and–the way she said it, she said that he was able to get inside her.

9

. . . And she did say that he put his dick in her vagina and she couldn't scream because he did cover her mouth. . . . At 426 Pendale, it happened–she said five or six times. . . . She said that at that house she saw white stuff on the bed one time.

She said stuff did happen there at 12341 Tierra Inca. She said she was 11 or 12 when something happened, and she said it happened two times and they were the same. She said the only difference between those two times was that one time there was white stuff coming out of his penis.

.     .     .

Yes. So she said that in [t]his house she actually did have her bedroom, but the bedroom was next to the restroom and [Appellant] would also ask Mom, "Hey, can I shower?" same as the other house. And in this bedroom she was able to close the door, but it wouldn't lock. So she would actually put a shoe, and he would just pretty much force it off and go inside.

.     .     .

So pretty much, when he came inside, he looked at her and he laughed. And then he told her that if she screamed, that something was going to happen to her mom. And he–that he said, quote/unquote, "You already know what to do."

And she sat up–as soon as he walked in, I guess because she got startled, she sat up, and he pulled her toward him and he penetrated her vagina with his penis.

.     .     .

She said that he did penetrate her with his penis and then he pulled his penis out and he inserted three fingers in her vagina. And this is when she did see his–the white stuff come out of his penis.

Detective Smith said that according to D.M., D.M. had been continuously raped from 2014 through 2017.

### (5)   Analysis

D.M.'s testimony concerned assaults at two addresses. Her detailed statements to both detectives about what happened at the Pendale residence involved the same event (involving Appellant exposing his genitals and penetrating D.M. with his penis). We therefore conclude the

10

trial court erred by allowing both detectives to testify about the same event at the Pendale residence.

However, the testimony regarding what happened at the Tierra Inca residence differed. D.M. told Detective Azar Appellant attempted to assault her, but she gave no details. D.M.'s statement that Appellant tried unsuccessfully to assault her amounted to no more than a general allusion or insinuation that a second sexual assault had occurred. In contrast, D.M. first provided details about penetration occurring at the Tierra Inca residence during Detective Smith's interview.

D.M. told Detective Smith that Appellant "penetrate[d] her with his penis and then he pulled his penis out and he inserted three fingers in her vagina." Thus, the trial court could have concluded that D.M's first outcry regarding both digital and penile penetration occurring at the Tierra Inca residence did not occur until her interview with Detective Smith, when she provided more than a general insinuation of sexual abuse. *See Polk v. State*, 367 S.W.3d 449, 453 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (complainant made detailed outcry to her adult brother about Appellant's contact with her vagina; complainant did not reveal to her brother that Appellant also had touched her anus in the same encounter; complainant first offered details about Appellant's contact with her anus during her subsequent conversation with her mother); *Josey v. State*, 97 S.W.3d 687, 693 (Tex. App.—Texarkana 2003, no pet.) (concluding that mother was proper outcry witness for act of oral contact, but forensic interviewer was proper outcry witness for act of digital penetration).

Because D.M. first described two different types of abuse—digital and penile penetration at the Tierra Inca residence—to a second outcry witness (Detective Smith), the second witness could testify about the different types of abuse. *See Tear*, 74 S.W.3d at 559. Therefore, we conclude the trial's decision to allow Detective Smith to testify was not an abuse of discretion.

11

## C.  Harm analysis

Having found that the trial court erred in allowing Aurora to testify as an outcry witness and in allowing both detectives to testify as outcry witnesses about what happened at the Pendale residence, we must conduct a harm analysis to determine whether the trial court's errors affected Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). The erroneous admission of hearsay testimony under Article 38.072 is non-constitutional error. *See Nino v. State*, 223 S.W.3d 749, 754 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Improper admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial. "In cases involving the improper admission of outcry testimony, the error is harmless when the victim testifies in court to the same or similar statements that were improperly admitted or other evidence setting forth the same facts is admitted without objection." *Gibson v. State*, 595 S.W.3d 321, 327 (Tex. App.—Austin 2020, no pet.); *see also West v. State*, 121 S.W.3d 95, 105 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding error in admitting outcry testimony did not influence jury's verdict or had but a slight effect because complainant provided detailed testimony regarding the offense); *Thomas v. State*, 1 S.W.3d 138, 142 (Tex. App.—Texarkana 1999, pet. ref'd) (holding error in determining child complainant's mother was proper outcry witness but admitting her testimony about complainant's statements of sexual abuse by defendant was harmless where record was replete with testimony from witnesses other than mother concerning complainant's statements about offense); Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1) (conviction is supportable by uncorroborated testimony of victim 17 years of age or younger).

We first note, as stated above, that D.M.'s statement to Aurora did not include specific details, i.e., the "how, when, and where" of the abuse. On the other hand, D.M. testified at trial without objection to details of the abuse. D.M. testified that while at the Pendale residence, Appellant exposed his "private part" to her and touched her vagina with his fingers under her clothes while he held himself and moved his hand "back and forward." She said this happened more than ten times, but she could not remember how old she was. D.M. stated she was about eight years old when the family moved to the Tierra Inca residence. D.M. said Appellant would expose himself, touch "her privates" with his hand under her clothes, take her clothes off, and "put his private part in" her. She said he raped her more than once, but she could not remember how many times. In addition to D.M.'s testimony, Detective Azar testified without objection about what D.M. told her. After examining the record as a whole, we conclude the trial court's error in admitting Aurora's testimony and in allowing both detectives to testify about the same events at the Pendale residence did not have a substantial and injurious effect or influence in determining the jury's verdict.

### D. Conclusion

For the reasons stated above, we overrule Appellant's first issue.

## CROSS-EXAMINATION OF D.M.

In his second issue, Appellant asserts the trial court erred when it prevented him from cross-examining D.M. about the circumstances leading up to and surrounding her outcry to Aurora. Appellant contends the purpose of the questioning was to explore D.M.'s motives for making her outcry when she did.

### A. Background

Before trial, the court granted the State's motion in limine regarding "[a]ny evidence of previous sexual misconduct on the part of any witness for the State of Texas until such time as the State of Texas has had an opportunity to ascertain whether such evidence is in violation of Texas [Rule of Evidence] 412." During opening statements, defense counsel informed the jury as follows:

> [The State] told you that [D.M.]–she's 17 years old. She's going to turn 18 this year. Back in 2020, when she was 15, she was getting into a lot of trouble. She was being disrespectful at home. She was–

The State interrupted with an objection that "[t]his was covered in our motion in limine," and the trial court instructed counsel to inform the jury only "that there was a motivation or reason why [D.M.] made the outcry. And leave it at that and they can fill in the blanks later when you provide them with evidence[.]" Defense counsel then told the jury,

> You're going to hear that [D.M.] and her mother were having issues and that they had a very serious conversation about these issues. And during that conversation, [D.M.] told her mom, "You don't know what I've been through. You don't know about my life," and that her mom–and at that point, [D.M.] told her mother, "I've been sexually assaulted by [appellant]," that her mom–they had a brief conversation–that her mom took her to the police station to report it. And that happened in August of 2020. All right?

During Aurora's cross-examination, defense counsel asked Aurora about the circumstances under which D.M. made her outcry:

Q. Now, what was this argument about?

A. Because I had punished her and I took away the cell phone.

Q. Okay. And that's what's on your statement [to the police]; right? That you had grounded her and you had taken her cell phone away from her; right?

A. Yes.

Q. Why was the reason – what was the reason that you took [D.M.'s] cell phone away from her?

14

A.   Because she did not do the housework that I had told her to.

Q.   Okay. Now, you – you were present when [D.M.] provided her statements to the detectives; correct?

A.   Yes. Everything was spoken in English.

Q.   Okay. Well, isn't it true that the reason that you actually grounded [D.M.] was because she was talking to a boy?

.     .     .

Q.   So the real reason that you grounded [D.M.] is because she was talking to a boy; right?

A.   I don't remember.

Q.   Okay. So you don't remember that in that occasion [D.M.] told you that a guy tried to grab her . . . [State's objection overruled]

Q.   She told you that a guy tried to grab her and that they both started talking about sex. You don't remember [D.M.] telling you that?

A.   I don't remember.

Q.   And you don't remember that that's when you got very upset with her for talking about sex with that guy?

A.   It was because she did not do the housework.

.     .     .

Q.   Okay. So let me rephrase the question, because I'm not asking you if you understand something during the interview. I'm asking you: If [D.M.] say [sic] that you had got mad at her for talking about sex with a – another boy, that is not true or is that true?

A.   I don't remember.

Before defense counsel cross-examined D.M., the trial court revisited its earlier decision about questioning D.M. about the circumstances leading up to her outcry. Defense counsel stated:

15

One of them [referring to the State's motion in limine] is any, I guess, sexual misconduct and also bad acts and all that. So I anticipate that when I ask around the–I guess the argument that the complaining witness had with her mom, the reason for that is because she was caught talking about sex with another male individual.

The court ruled:

Yeah. I don't–I'm not going to allow that. I mean, at this point, I think the rule on that is pretty clear. And to suggest that a teenager who is still underage, who is the alleged victim in a case like this, any kind of sexual impropriety, even if they were consensual matters, it just would be wholly inappropriate. I'm not going to allow it.

Defense counsel responded:

And, Your Honor, I would like to note my objection for the record. We're basing this on Rule 412. And it's correct, there is a specific prohibition that in this type of cases [sic] any evidence of the victim's past sexual behavior or any specific instances of the victim's past sexual behavior are not allowed, but it has a bunch of exceptions as well. And one specific exception is if it relates to the victim [sic] motive or bias. And I think this is what [co-defense counsel] was trying to get on his opening statement. I think there's [a] strong relationship between the time that she chose to come out with this. It can be–the jury can determine that this–that the time that she chose to make these allegations were very convenient while she was getting in trouble for talking about sex with another individual and to deviate the attention or whatever consequences were going to be for the conduct that she was being engaged with [sic] at the time.

## B. Error preservation

We first address the State's contention that Appellant did not preserve this issue for our review because he failed to make an offer of proof as to the substance of D.M.'s testimony. Texas Rule of Evidence 103 details how to properly make an offer of proof to excluded testimony at trial: "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and, . . . if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Tex. R. Evid. 103(a)(2). "The offer of proof may be in question-and-answer form or in the form of a

16

concise statement by counsel." *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009). However, Rule 103 is distinct from Texas Rule of Appellate Procedure 33.1, which imposes the requirement of making a specific request, objection, or motion stating "the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" to preserve error on appeal. Tex. R. App. P. 33.1(a)(1)(A).

In *Holmes v. State*, the Court of Criminal Appeals "recognized a distinction between the general rule in Rule 103(a)(2) and the case in which the defendant is not permitted to question a State's witness about matters that might affect the witness's credibility." 323 S.W.3d at 168.

> In the latter case, the defendant need not show what his cross-examination of the witness would have affirmatively established; he must merely establish what general subject matter he desired to examine the witness about during his cross-examination and, if challenged, show on the record why such should be admitted into evidence. In such a case the trial court's ruling has prevented a defendant from questioning a State's witness about subject matters which affect the witness's credibility, that is, matters which might show malice, ill feeling, ill will, bias, prejudice, or animus. The distinction between these kinds of cases may have been blurred by the similarity of language in two expressions: the credibility of a witness's testimony and a witness's credibility. The former expression refers to the substance of the evidence; the latter refers to personal characteristics of the witness.

*Id.* The Court then clarified the exception:

> [W]here the defendant, in cross-examining a State's witness, desires to elicit subject matters that tend to impeach the witness's character for truthfulness–for example, to show malice, ill-feeling, ill-will, bias, prejudice, or animus on the part of the witness toward the defendant–in order to preserve the issue for appellate review, he is not required to show that his cross-examination would have affirmatively established the facts sought, but merely that he desired to examine the witness with regard to those specific subject matters that tend to impeach the witness during his cross-examination.

*Id.* at 170.

17

In this case, Appellant did not make an offer of proof under Rule 103(a)(2). However, pursuant to Rule 33.1(a)(1)(A), he notified the trial court of his desire to cross-examine D.M. about the circumstances of her argument with her mother, which in turn led to D.M.'s outcry. Appellant explained his line of questioning was not meant to violate Rule 412's prohibition against eliciting evidence of D.M.'s past sexual behavior. *See* Tex. R. Evid. 412(a)(2) ("specific instances of a victim's past sexual behavior" "is not admissible in a prosecution for sexual assault, aggravated sexual assault, or attempt to commit sexual assault or aggravated sexual assault"). Instead, he sought to elicit evidence under the exception to Rule 412(a)(2)—testimony about why she made the outcry when she did—for the purpose of establishing her motive for the outcry. *See* Tex. R. Evid. 412(b)(2)(C) ("Evidence of specific instances of a victim's past sexual behavior is admissible if . . . the evidence . . . relates to the victim's motive or bias[.]"). We conclude that Appellant was not attempting to challenge "the credibility of" D.M.'s testimony by exploring her past sexual behavior (the substance of the evidence). *See Holmes*, 323 S.W.3d at 170. Instead, Appellant's attempted scope of questions was aimed at D.M.'s credibility as a witness (the "personal characteristics of the witness"). *Id.* at 169 Therefore, we conclude that Appellant preserved his issue for our review pursuant to Texas Rule of Appellate Procedure 33.1. Accordingly, we next consider the merits of his complaint.

### C. Did the trial court err

"The scope of appropriate cross-examination is necessarily broad." *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). A defendant may cross-examine a witness on any subject "reasonably calculated to expose a motive, bias or interest for the witness to testify." *Id.* By limiting the cross-examination of D.M. regarding her possible motive for making her outcry to her mother, the trial court denied the jury the thrust of Appellant's defense theory—that D.M. had a

motive to fabricate her outcry against him—thus depriving the jury of the ability to make an informed decision regarding the weight to accord D.M.'s testimony. Therefore, we conclude the trial court erred by limiting Appellant's cross-examination of D.M. We next consider whether Appellant was harmed by the error.

### D. Harm analysis

For the first time on appeal, Appellant asserts his constitutional right to confront a witness was violated and this court should apply a three-prong test to determine harm. *See Shelby v. State*, 819 S.W.2d 544 (Tex. Crim. App. 1991) (en banc) (applying three-prong harm analysis to violation of Confrontation Clause). [6] However, Appellant did not raise an objection based on the Confrontation Clause before the trial court. The trial court considered Appellant's argument under Rule of Evidence 412, not the Constitution; thus, Appellant has not preserved his constitutional complaint for our review. *See Merrick v. State*, 567 S.W.3d 359, 369 (Tex. App.—Ft. Worth 2018, pet. ref'd) (holding same). We therefore evaluate this error as nonconstitutional and evaluate harm based on whether it affected appellant's substantial rights.

Nonconstitutional error that does not affect an accused's substantial rights is harmless and must be disregarded. Tex. R. App. P. 44.2(b). Substantial rights are not affected if the Court, based on the record as a whole, has a fair assurance that the erroneous exclusion of evidence either had no influence or only a slight influence on the jury. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim.

---

[6] The three prongs of the test are as follows. First, the appellate court must assume that the damaging potential of the cross-examination was fully realized. *Shelby v. State*, 819 S.W.2d 544, 547 (Tex. Crim. App. 1991) (en banc). Second, with that assumption in mind, the appellate court must review the error in connection with the following factors: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Id.* Third, in light of the first two prongs, the appellate court must determine whether the error was harmless beyond a reasonable doubt. *Id.*

App. 2002). In making our assessment, we consider everything in the record, the nature of the evidence supporting the verdict, the character of the alleged error, and how it relates to other evidence in the record. *Id.* We also may consider the jury instructions, the State's theory and any defensive theories, closing arguments, and voir dire, if applicable. *Id.*

During opening statements, defense counsel reminded the jury that they would be asked to convict Appellant based on the testimony of a single witness—D.M.—and her testimony would "not add up," would "not make sense," would "not be corroborated," and there were "serious discrepancies" between D.M.'s two statements to the police. Regarding the outcry to her mother, the trial court did not allow defense counsel to tell the jury D.M. made the outcry because D.M. was getting into trouble.[7] Instead, counsel told the jury D.M. and her mother "were having issues" and "they had a very serious conversation about these issues." Appellant's defense, therefore, rested on challenging D.M.'s credibility, which he did by cross-examining D.M. about her outcry to her mother and her two statements to the police.[8]

On direct examination, D.M. testified that Appellant "raped" her on more than one occasion "by put[ting] his private part in" hers. When she made the general outcry to her mother, they went to the police station the next day, and she remembered giving two statements about 30 days apart.[9] On cross-examination, defense counsel asked D.M. about discrepancies between her trial testimony and the statements and discrepancies between the two statements. Despite being

---

[7] Defense counsel asked the trial court if he could "say that [D.M.'s] mom confronted her and that's why she said that she had been raped." The court replied, "No. Because then we start getting–I mean, you can still accomplish what you need to accomplish by saying there were certain things going on. You'll hear about it and you're going to understand the motivation why she did what she did. Obviously, in your words, but along those lines."

[8] Defense counsel also questioned other witnesses for the State about the discrepancies in D.M.'s statements.

[9] Then-Officer Claudia Azar took the first statement from D.M. at the police station in August 2020. Detective Lourdes Smith took D.M.'s second statement in September 2020. D.M. was fourteen years old at the time.

given leeway to ask D.M. about "certain things going on" with Aurora as the motivation for D.M.'s outcry to her mother, defense counsel did not ask D.M. about any "issues" or any "very serious conversation [with her mother] about these issues."

Defense counsel asked Aurora about the outcry, "I'm asking you: If [D.M.] say [sic] that you had got mad at her for talking about sex with a–another boy, that is not true or is that true?" Aurora responded that she did not remember. During closing arguments, defense counsel again reminded the jury that D.M.'s story "evolved." Counsel also spent a significant portion of his closing arguments walking the jury through the inconsistencies in D.M.'s statements to the police.

Our review of the record reveals that Appellant challenged D.M.'s credibility in a number of ways. Therefore, based on the record as a whole, we have a fair assurance the erroneous exclusion of evidence had, at best, only a slight influence on the jury. Accordingly, we overrule Appellant's second issue.

## JAIL CALL

In his third issue, Appellant asserts the trial court erred when it admitted into evidence a recording of a Spanish-language telephone call between him and his wife (Mercedes) while he was incarcerated.

### A. Background

During trial, the court heard defense counsel's objections to the State's offer of the recording and translation on various grounds, including that the call did not satisfy the requirements of Texas Code of Criminal Procedure 38.37 and the call was prejudicial.[10] The court admitted the call and translation into evidence.

---

[10] Appellant also objected that the call was not relevant and was hearsay within hearsay, violated his right of confrontation as to the circumstances surrounding the call or the veracity of the allegations made in the conversation, and the translation of the call differed from what was said on the call. Appellant does not argue these points on appeal.

21

The audio of the call, which is in Spanish, was played for the jury. The English translation of the call reveals Mercedes told Appellant that her daughter, S.C., told her the following:

> Well, [S.C.] told me that, she couldn't stand it anymore, but she said, "He never did anything to me, mom. He never touched me." She said, "I know that he is going to tell you that it's a lie. I-I never told you. Not out of fear." She said, "simply because you weren't going to believe me." And of course I do believe her. I do believe my daughter. That, she told me that-that you, ever, since she was young, she said, "I was still with Alonso, mom." She said, "and when he would come back drunk–he never touched me. He never did anything to me." She said[] "But every time that he'd come back drunk," . . . "he would masturbate in front of me."

When Appellant denied S.C.'s allegation, Mercedes told him not to deny it because she had "caught" him. Mercedes then told Appellant,

> [S.C.] said, "and he's going to tell you that it's not true, that he was drunk." She said, "But he would always do that. He would masturbate in front of me when you weren't in the house because he was a little drunk." She said, "But, he wasn't drunk." . . . "Because he would just sense that you were going to go out or that you were on your way home." I said, "Why didn't you ever tell me?" She said, "Because . . . you weren't going to believe me. It already happened–this is what happened and I didn't want to hurt you more." And you see, how much it hurt me, sweetheart. Wasn't I enough woman for you?

Appellant responded,

> Well/no–yes. Well/no–well/no–yes–yes–yes–yes. I don't–don't have anything to say about that. But that about–[S.C.], yes, yes, I remember now, honey, about–about that time. Yes. Yes–yes–yes. Because yes, I don't know what more or less happened, and okay. But yes, well, you are right. Uh huh . . . Yes, you are right about that, honey.

Mercedes told Appellant, "the thing . . . about [D.], the thing about [L.], you can tell me because they're my nieces. But, about my daughter, honey, it hurt me." Appellant replied,

> Yes, well, well/no, that time, honey, I do–do remember. Yes, you are right, but I don't . . . know. I don't know. Like I told you, I don't know what . . . happened to me. If I got frustrated or I don't know. What can I say.

Regarding whether there were other incidents involving S.C., Mercedes told Appellant, "[i]t wasn't only that time, sweetheart, yes, there were several times. And it was ever since she . .

. was twelve years old." Appellant responded, "No–no–no–no. What then? No–no. No, please no. No–no–no–no."

When Appellant said he would call her again, Mercedes told him not to call until he had the courage to tell the truth, to which Appellant responded, "Well I told you that, it's . . . only that time" and "I just remember about that time . . . [n]othing else."

On appeal, Appellant contends the trial court erred in admitting the call because (1) the State failed to prove up the extraneous offense purportedly discussed in the recording under Code of Criminal Procedure Article 38.37, (2) the State did not prove S.C. was younger than 17 years old at the time of the alleged extraneous offense, (3) admitting the portions of the call that he adopted was substantially more prejudicial than probative, and (4) he was harmed by the error.

### B.   Article 38.37

Texas Rule of Evidence 404(b) prohibits "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). However, notwithstanding Rule 404, Article 38.37 provides that "evidence that the defendant has committed a separate offense described by Subsection (a)(1) [offenses "against a child under 17 years of age"] or (2) [offenses "against a person younger than 18 years of age"] may be admitted in the trial of an alleged offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. Ann. art. 38.37 § 2(b); *Romano v. State*, 612 S.W.3d 151, 158 (Tex. App.— Houston [14th] 2020, pet. ref'd) (holding Article 38.37 "applies to certain types of sex-based offenses" against children). Before such evidence may be introduced, the trial court must conduct a hearing outside the jury's presence to "determine that the evidence likely to be

23

admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." *Id.* § 2-a. "Adequate under section 2-a means legally sufficient." *Romano*, 612 S.W.3d at 159. "If the statutory requirements of article 38.37 are met, evidence that ordinarily would be inadmissible under rule 404(a)(1) becomes admissible." *Id.* at 158.

On appeal, the parties disagree as to whether Appellant "adopted" S.C.'s allegations against him. The State asserts that based on Appellant's admission during the call to having committed the extraneous act of masturbating in front of Mercedes's daughter, the jury could find beyond a reasonable doubt that he committed this act; therefore, Article 38.37, § 2-a is satisfied. Appellant counters that he never admitted to committing any extraneous offense. Appellant's argument on appeal is slight at best; however, in the interest of justice we will construe his argument as contending S.C.'s allegation was hearsay and therefore could not be used as evidence to satisfy Article 38.37, § 2-a.

Hearsay is not admissible unless allowed by statute, the Rules of Evidence, or other rules prescribed under statutory authority. Tex. R. Evid. 802. Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." *Id.* 801(d)(1-2). A statement is not hearsay if the "statement is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true[.]" *Id.* 801(e)(2)(B). "Statements made by others in a defendant's presence may be admissible as adoptive admissions if the defendant, . . . by his actions and responses, showed agreement with the statements." *State v. Villegas*, 506 S.W.3d 717, 745 (Tex. App.—El Paso 2016), *pet. dism'd*, *State v. Villegas*, 544 S.W.3d 375 (Tex. Crim. App. 2018) (per curiam) (citation omitted).

As the proponent of the evidence, the State had the burden of proving to the trial court, by a preponderance of the evidence, that Appellant's statements to Mercedes during the telephone conversation qualified as an adoptive admission under Rule 801(e)(2)(B). *Alvarado v. State*, 912 S.W.2d 199, 215 (Tex. Crim. App. 1995) (en banc), *overruled on other grounds by Warner v. State*, 245 S.W.3d 458 (Tex. Crim. App. 2008). We review a trial court's ruling on the admission of evidence under an abuse-of-discretion standard. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). We uphold the trial court's ruling unless it is outside the zone of reasonable disagreement. *Id.*

Here, Mercedes told Appellant that S.C. confided in her that "ever since she was young," "he would always do that. He would masturbate in front of me when you weren't in the house because he was a little drunk." During their discussion about whether he masturbated in front of his step-daughter, Appellant responded: "I do–do remember," "Yes, you are right, but I don't . . . know," "Like I told you, I don't know what . . . happened to me," "If I got frustrated or I don't know," "Well I told you that, it's . . . only that time," and "I just remember about that time . . . [n]othing else." Regarding S.C.'s age at the time, Mercedes stated Appellant's behavior had been on-going "since [S.C.] was twelve years old."

In an Article 38.37, § 2-a hearing, "the trial court is the fact finder and as such, is the sole arbiter of the credibility of the witness and the weight given to his or her testimony." *Deggs v. State*, 646 S.W.3d 916, 924 (Tex. App.—Waco 2022, pet. ref'd). The trial court can resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences therefrom. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Here, Appellant's, at times, stuttering responses did not render his testimony inadequate under Article 38.37. The trial court could have reasonably inferred from Appellant's responses that he adopted both the allegation of an

25

extraneous offense and that the offense occurred when S.C. was under the age of 17. Based on these implied findings, the trial court apparently "determine[d] that the evidence likely to be admitted at trial w[ould] be adequate to support a finding by the jury that [Appellant] committed the separate offense beyond a reasonable doubt." *See* Tex. Code. Crim. Proc. Ann. art. 38.37, § 2-a(1). On this record, we conclude the trial court did not abuse its discretion by doing so.

### C. Rule 403 balancing test

Appellant concedes he may have admitted to *something* when he said to Mercedes, "it's . . . only that time" and "I just remember about that time . . . [n]othing else." He asserts the probative value of the jury hearing him make an "ambiguous acknowledgement" is substantially outweighed by the confusing nature of the conversation and the prejudicial effect of hearing Mercedes's "inflammatory" statement about S.C.'s allegations.

When evidence of a defendant's extraneous act is determined to be relevant and admissible under Article 38.37, § 2(b), the evidence remains subject to exclusion under Rule of Evidence 403. *Wishert v. State*, 654 S.W.3d 317, 331 (Tex. App.—Eastland 2022, pet. ref'd); *see also Deggs*, 646 S.W.3d at 925 (holding admission of evidence pursuant to Article 38.37, § 2(b) is limited by Rule 403's balancing test). Rule 403 allows a trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

A trial court undertaking a Rule 403 analysis must balance "(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to

26

be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted." *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). On appeal, Appellant focuses his argument on the first three factors.

### (1) Probative value

"[P]robative value means more than simply relevance." *Id.* at 641. "Probative value" "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Id.* If the proponent "has other compelling or undisputed evidence" to prove the fact, then the item's probative value "will weigh far less than it otherwise might in the probative-versus-prejudicial balance." *Id.*

"[E]vidence of a separate sexual offense against a child admitted under Article 38.37, Section 2(b) is probative of a defendant's character or propensity to commit sexual assaults on children." *Deggs*, 646 S.W.3d at 925; *Alvarez v. State*, 491 S.W.3d 362, 371 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) ("Because the evidence of prior sexual abuse of children was especially probative of Appellant's propensity to sexually assault children, the Rule 403 balancing test normally will not favor the exclusion of evidence of the defendant's prior sexual assaults of children."). We conclude the evidence relating to the extraneous offense offered by the State was probative of Appellant's character or propensity to commit sexual offenses with children. As a result, we conclude this factor weighs strongly in favor of admission.

### (2)    State's need for the evidence

"Sexual assault cases are frequently he said, she said trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence." *Hammer v. State*, 296 S.W.3d 555, 561– 62 (Tex. Crim. App. 2009). The courts therefore should use Rule 403 "sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant in such he said, she said cases." *Id.* at 562.

Appellant contends the State's need for the telephone call was low because the State also called two other extraneous-offense witnesses. One witness, A.D., testified to an occasion when Appellant grabbed her "trying to put his private area like close to where my rear area was." She could not remember her age at the time, but she knew she was younger than 17 years of age. She said there were other occasions when Appellant was "inappropriate" with her, but she could not recall the details. The second witness, L.M., testified that when she was six or seven years old, Appellant "came behind me [while she was sitting in a van coloring], and . . . he put his hands on the seat of the van" and "thrust ["his hard penis"] into my butt as I was bent over coloring. And he would–just kept doing it." She also described several incidents when Appellant masturbated in front of her.

Here, D.M.'s outcry came several years after the assault and there was no eyewitness testimony or physical evidence of abuse, such as DNA or documented injuries to D.M. The State's case against Appellant rested on D.M.'s testimony about the assault and statements she made to others about it. It was, in essence, Appellant's word against hers. Although A.D. and L.M. testified about alleged extraneous offenses involving Appellant, the extraneous offense about which S.C. told Mercedes was the only offense adopted by Appellant. Therefore, we conclude the State's need

for this evidence to support D.M.'s credibility was not insignificant. Accordingly, this factor does not weigh against admission. *See Dies v. State*, 649 S.W.3d 273, 286 (Tex. App.—Dallas 2022, pet. ref'd).

### (3) Improper basis

The phrase, "unfair prejudice," "refers to a tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Gigliobianco*, 210 S.W.3d at 641. "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Id.*

"[E]vidence of previous child sexual abuse is inherently inflammatory by nature and, hence, can be prejudicial." *Dies*, 649 S.W.3d at 286; *see also Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) ("When we examine the potential to impress the jury in some irrational but unforgettable way, we cannot ignore our statements that sexually related bad acts and misconduct involving children are inherently inflammatory."). "However, the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial." *Pawlak*, 420 S.W.3d at 811. "Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Id.* The question in a Rule 403 analysis is whether the evidence was *unfairly* prejudicial. *See Caston v. State*, 549 S.W.3d 601, 612-13 (Tex. App.— Houston [1st Dist.] 2017, no pet.) (acknowledging "evidence that appellant sexually abused another child in addition to the complainant in the charged offense was 'clearly prejudicial' to his case," but he did not establish it "was *unfairly* prejudicial").

Here, the potential for unfair prejudice was relatively diminished by the fact that S.C.'s allegations were not more serious than D.M.'s allegations. *Dies*, 649 S.W.3d at 286 ("Yet this potential was diminished in this case by the fact that AD's allegations were no more serious than

29

complainant's. Indeed, although appellant initially abused both girls in similar fashion, his abuse of complainant grew worse over time, and she recounted more instances of abuse than AD, and in greater detail."). Further, any tendency to draw impermissible inferences of guilt "can be minimized through a limiting instruction." *Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We generally presume a jury will follow the trial court's instructions in the manner presented, which mitigates the potential for prejudice. *See Garcia v. State*, 614 S.W.3d 749, 757 (Tex. Crim. App. 2019). In this case, the trial court instructed the jury as follows:

> [I]f there is any evidence before you concerning alleged offenses against a child under seventeen years of age, other than the complainant alleged in the indictment, such offenses or offenses, if any, may only be considered if you believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and then you may consider said evidence for any bearing the evidence has on relevant matters including the character of the defendant and acts performed in conformity with the character of the defendant.

We conclude the extraneous-offense evidence did not create a significant potential to impress the jury in an irrational but indelible way. Therefore, this factor does not weigh against admission.

### (4) Conclusion

We conclude that after balancing the Rule 403 factors, the trial court could have reasonably concluded the probative value of the evidence in question was not substantially outweighed by the danger of unfair prejudice and the other Rule 403 factors. Accordingly, the trial court did not abuse its discretion in admitting the extraneous-offense evidence contained in the telephone call. Because we conclude that the trial court did not err by admitting the evidence, we need not conduct a harm analysis. We overrule Appellant's third issue.

# JURY SHUFFLE

In his fourth issue, Appellant asserts the trial court erred when it denied his request for a jury shuffle, and he was harmed by the error.

## A. Background

Before the venire panel entered the courtroom, defense counsel requested a jury shuffle. The trial court denied the request on the following basis:

> [The request was made] before we had seen anybody, you know, or had any reason to look at the jury and say, "This is why." There is a reason why we set a deadline for when a shuffle can be requested, and we give counsel plenty of time to review the jury sheets, review the information regarding a juror so that we can then prepare and be more efficient in our process today and prepare, for example, our seating chart. So for those reasons of efficiency, and I find there is no bias–or any prejudice, I should say, against any of the parties by following this procedure, which has always been the Court's procedure, your request is denied.

## B. Applicable law

Texas Code of Criminal Procedure Article 35.11 provides as follows:

> The trial judge, on the demand of the defendant or his attorney, or of the State's counsel, shall cause a sufficient number of jurors from which a jury may be selected to try the case to be randomly selected from the members of the general panel drawn or assigned as jurors in the case. The clerk shall randomly select the jurors by a computer or other process of random selection and shall write or print the names, in the order selected, on the jury list from which the jury is to be selected to try the case. The clerk shall deliver a copy of the list to the State's counsel and to the defendant or his attorney.

Tex. Code Crim. Proc. Ann. art. 35.11. "Article 35.11 provides an accused with an absolute right, after viewing the seating of the members of the jury panel in the courtroom, to have the names of the members of the jury panel shuffled and the panel reseated in a new and random order." *Ford v. State*, 73 S.W.3d 923, 931 (Tex. Crim. App. 2002) (Holcomb, J., dissenting). A request for a jury shuffle is timely if made prior to commencement of voir dire. *Ex parte Daigle*, 848 S.W.2d 691, 692 (Tex. Crim. App. 1993) (en banc).

31

## C. Analysis

It is undisputed that Appellant requested a shuffle of the venire panel immediately prior to voir dire. However, the State argues this request was premature because neither the trial court nor the parties had had the opportunity to review the jury sheets or view the venire panel seated in the courtroom in its proper order. The State also contends Appellant's request occurred before any justification for such a request could have arisen. While we agree that Appellant's request for a jury shuffle came before "viewing the seating of the members of the jury panel in the courtroom," we will assume without deciding that the trial court erred by refusing Appellant's request for a jury shuffle. Therefore, we next assess whether he was harmed by the error.

Because the right to a jury shuffle is statutory rather than constitutional, we will reverse a trial court's improper denial of a motion to shuffle the jury only if we conclude that Appellant was harmed by the error. *Ford*, 73 S.W.3d at 924–25. Harm is caused by nonconstitutional error if one of the defendant's substantial rights was affected. *Id.* Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Therefore, the relevant inquiry in determining harm is "whether the jury shuffle statute's purpose was thwarted by the error." *Ford*, 73 S.W.3d at 926. The purpose of the jury shuffle statute is to "ensure that the members of the venire [were] listed in random order." Thus, harm will be shown by an indication that the venire members were not listed in a random order. *Id.* Panels must be listed randomly according to the applicable law and rules. *Id.* ("Randomness is ensured by statutes directing the drawing of names, by the certification of the jury list, and by provisions for electronic or mechanical methods of selection.") *Id.*

Because the law requires that venire panels be assembled in random order, a trial judge's failure to order a shuffle does not, by itself, indicate a non-random listing of the venire members.

In this case, nothing in the record indicates that the statutes or rules by which the initial panel would have been drawn were disregarded. Appellant requested the shuffle before the venire panel was seated. On appeal, he does not explain his reason for the request, and he provides no strategic reason for requesting the shuffle. *See Davis v. State*, 782 S.W.2d 211, 214 (Tex. Crim. App. 1989) (en banc) ("In interpreting Article 35.11, we have determined that compliance with that statute is had when counsel for either the State or the defendant is allowed the opportunity to view the venire seated in the courtroom in proper sequence and is thereafter allowed an opportunity to exercise his or her option to have the names shuffled."); *Ford*, 73 S.W.3d at 931 (Holcomb, J., dissenting) ("That is to say, by way of Article 35.11, the Legislature has provided an accused with a strategic tool with which he can reconfigure the jury panel in the hope of either (1) placing visually preferred venire members earlier in the seating arrangement so as to increase the probability they will be selected or (2) placing visually non-preferred venire members later in the seating arrangement so as to decrease the probability they will be selected.").

Because the panel had not yet been assembled, we must assume the initial venire members would have been assembled in a random order. And there is no indication "that the process of assembling a jury panel was subverted in some fashion to achieve a nonrandom listing of the venire." *Id.* at 926. Therefore, we conclude the trial court's refusal to shuffle the panel was harmless. Accordingly, we overrule Appellant's fourth issue.

## CUMULATIVE HARM

In his fifth and final issue on appeal, Appellant asserts the cumulative harm of the trial court's errors affected his substantial rights.

A number of errors may be found harmful in their cumulative effect. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (en banc); *see also Martin v. State*, 151 S.W.3d 236,

242 (Tex. App.—Texarkana 2004, pet. ref'd) (appellate court should consider cumulative effect of multiple errors). The mere existence of multiple errors, however, does not warrant reversal unless they operated in concert to undermine the fundamental fairness of the proceedings. *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010); *Linney v. State*, 413 S.W.3d 766, 767 (Tex. Crim. App. 2013) (Cochran, J., concurring in refusal of pet.) ("A string of harmless errors does not arithmetically create reversible, cumulative error. Instead, we look for multiple errors that synergistically achieve the critical mass necessary to cast a shadow upon the integrity of the verdict.") (internal quotations and citations omitted).

As stated above, nonconstitutional error that does not affect an accused's substantial rights is harmless and must be disregarded. Tex. R. App. P. 44.2(b). In making our assessment of whether Appellant's substantial rights were affected, we consider everything in the record, the nature of the evidence supporting the verdict, the character of the alleged error, and how it relates to other evidence in the record. *Motilla*, 78 S.W.3d at 355. We also may consider the jury instructions, the State's theory and any defensive theories, closing arguments, and voir dire, if applicable. *Id.* at 355–56.

Appellant asserts the trial court's errors allowed the State to bolster D.M.'s "ever-evolving" account of abuse by permitting the two detectives to testify about D.M.'s outcries and deprived him of his right to cross-examine D.M. about the critical timing and motive for her outcry.[11] Our harm analysis for these errors, which included a review of the record, is explained above. Based on our review, we concluded these errors did not affect Appellant's substantial rights. Appellant's

---

[11] Appellant also contends the trial court's errors "injected wholly unproven allegations of sexual misconduct involving an extraneous complainant." We take that to refer to the admission into evidence of the jail call, which we concluded was not in error.

cumulative error argument does not persuade us that the combined errors operated in concert to undermine the fundamental fairness of his trial. Accordingly, we overrule Appellant's fifth issue. *See Martin*, 151 S.W.3d at 245–46 ("In light of the record as a whole, we are reasonably assured that the errors, considered together, did not substantially influence the jury's verdict.").

## CONCLUSION

We affirm the trial court's judgment.


LISA SOTO, Justice

April 12, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)